# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| EMPLOYEES' RETIREMENT SYSTEM OF THE CITY OF BATON ROUGE AND PARISH OF EAST BATON ROUGE, on behalf of itself and all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>AARON'S, INC., JOHN W. ROBINSON, III, RYAN K. WOODLEY, and GILBERT L. DANIELSON,<br><br>        Defendants. | Civil Action No.<br><br><u>CLASS ACTION</u><br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (a) regulatory filings made by Aaron's, Inc., ("Aaron's" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by the Company; (c) analyst reports concerning Aaron's; and (d) other public information regarding the Company.

## **<u>INTRODUCTION</u>**

1.     This federal securities class action is brought on behalf of all those that purchased Aaron's common stock between February 6, 2015 and October 29, 2015, inclusive (the "Class Period").  The claims asserted herein are alleged against Aaron's and certain of the Company's senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

1

2.     Aaron's is a retailer of furniture, consumer electronics, computers, appliances and household accessories that offers flexible payment options for credit-challenged individuals.  Aaron's operates as a rent-to-own business, which allows customers to lease property in exchange for a weekly or monthly payment, with the option to purchase at some point during the agreement.

3.     Throughout the Class Period, Defendants touted to investors the strong revenue and sales growth generated by Progressive Finance Holdings, LLC ("Progressive"), the Company's most profitable subsidiary.  In addition, the Company specifically touted Progressive's proprietary algorithm, which it used to determine which customers meet the leasing qualifications.  These statements, and similar statements issued throughout the Class Period, were materially false and misleading.  In truth, Aaron's statements regarding Progressive were materially false and misleading because software issues related to the Progressive algorithm, including the loss of critical data, undermined Progressive's ability to determine which customers met the leasing qualifications.

4.     Investors learned the truth regarding Progressive's data loss on October 30, 2015, when the Company admitted that Progressive had lost two critical data feeds in February.  The Company acknowledged that the loss impacted the

Company's ability to make loans and collect payments.  Specifically, the loss of data caused the Company to experience "higher bad debt expense and merchandise write offs" and delayed the Company's "ability to identify and begin collections on certain delinquent accounts."  Aaron's senior executives admitted that the Company had discovered the data loss in February, nine months before it was disclosed to investors.  These disclosures caused Aaron's stock to decline by approximately $9 per share.

## JURISDICTION AND VENUE

5.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

6.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Aaron's maintains its U.S. headquarters in Atlanta, Georgia, which is situated in this District, and the acts and conduct that constitute the violations of law complained of herein, including the preparation and/or dissemination to the public of materially false and misleading information, occurred

in this District.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

7.     Plaintiff Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge ("Plaintiff"), is a defined benefit pension plan established in 1953 that provides retirement allowances and other benefits to regular employees of the City of Baton Rouge. As of January 1, 2016, Plaintiff managed approximately $1.1 billion in assets and served approximately 6,700 participants. Plaintiff purchased common shares of Aaron's on the New York Stock Exchange during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

8.     Defendant Aaron's is a leading provider in the sales and lease ownership and retailing of furniture, consumer electronics, home appliances and accessories.  Based in Atlanta, Georgia, the Company was founded in 1955 and has been publicly traded since 1982.  The Company maintains its U.S. headquarters at 400 Galleria Parkway SE, Suite 300, Atlanta, Georgia 30339-3182.  Aaron's

common stock trades on the New York Stock Exchange, which is an efficient market, under the ticker symbol "AAN."   Aaron's has over 70 million shares outstanding, owned by hundreds or thousands of investors.

9.     Defendant John W. Robinson, III ("Robinson") is, and was at all relevant times, President and Chief Executive Officer of Aaron's.

10.     Defendant Ryan K. Woodley ("Woodley") is, and was at all relevant times, Chief Executive Officer of Progressive.

11.     Defendant Gilbert L. Danielson ("Danielson") was at all relevant times, Chief Financial Officer of Aaron's.  Danielson retired on December 31, 2016.

12.     Defendants Robinson, Woodley and Danielson are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with Aaron's, possessed the power and authority to control the contents of Aaron's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information,

each of the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## BACKGROUND

13.   Aaron's operates as a rent-to-own business, which allows customers to lease property in exchange for a weekly or monthly payment, with the option to purchase at some point during the lease term.  In April 2014, the Company acquired Progressive, a leading virtual rent-to-own company.

14.   Progressive has no retail presence and instead of having customers physically go to retail stores, Progressive purchases the requested merchandise from stores and leases it to the customer.  A key advantage for Progressive over other virtual rent-to-own companies is Progressive's proprietary decision-making algorithm, which it uses to determine which customers meet its leasing qualifications.  According to Progressive's CEO, Ryan Woodley, the algorithm allows Progressive to "deliver the highest sustainable approval rate and highest sustainable conversion rate" which makes Progressive "the market leader in that regard."  Based on this, Defendants, including Aaron's new CEO and the former

CEO of Progressive, John Robinson, continued to tout Progressive and claim that the Company's revenue and earnings per share ("EPS") were expected to rise significantly during 2015 based on the success of Progressive.

15.    In truth, the Company discovered in February 2015 that Progressive was experiencing software issues, which caused the loss of two critical data feeds used to determine whether customers should be approved for loans.  This software problem caused the Company to experience higher write-offs and also resulted in a number of accounts not being properly identified as delinquent, causing delays in the collection process.

## AARON'S DEFRAUDS INVESTORS

16.    The Class Period starts on February 6, 2015, the day that Aaron's held its earnings conference call for the fourth quarter of 2014.  On that call, the Company touted the strength of Progressive's business, and projected revenue for Progressive of approximately $1 billion to $1.10 billion for fiscal 2015. The Company also projected 2015 adjusted EPS of $1.90 to $2.10, representing earnings growth of 17% to 30%.  Further, Robinson emphasized that while write-offs for Progressive had been trending upwards, this was not a concern, stating that the increase in write-offs

"is a trend we are monitoring closely and have taken into account in the guidance we're providing today for 2015."

17.     In an earnings call held that same day, the new CEO of Progressive, Ryan Woodley, distinguished Progressive from other virtual rent-to-own competitors, citing its "centrally-automated decisioning algorithms . . . . the beauty of the model is our ability to make changes at any time to the underwriting algorithm, which we do on an ongoing basis."

18.     On April 24, 2015, the Company announced its financial results for the first quarter of 2015 and increased its earnings guidance for Progressive, stating that Progressive revenues for 2015 were now expected to be in the range of $1.05 billion to $1.15 billion.  The Company also raised its adjusted earnings per share guidance to a range of $2.01 to $2.21 for fiscal 2015.  In an earnings call held that same day, the Company's CFO, Gilbert Danielson, emphasized that the increase in guidance was based on Progressive's success, stating, "[w]e are increasing our previously announced full-year 2015 guidance to reflect Progressive's strong results in the quarter."

19.     In addition, Woodley continued to tout Progressive's proprietary decision-making algorithm as what separated it from competitors, stating, "[w]here

we've found we win with retailers is when we can deliver the highest sustainable approval rate and highest sustainable conversion rate. And we do that by constantly improving our underwriting algorithm, which allows us to buy as deep as possible. We feel we are the market leader in that regard and we've invested a lot and are continuing to maintain that edge."

20.     The statements and omissions set forth in ¶¶16-19 were materially false and misleading.  In truth, Defendants discovered in February 2015 that Progressive was experiencing software issues that impacted its use of the algorithm.  These software issues led to the Company losing two critical data feeds, which were used to determine which customers would be approved for loans.  The data loss made it impossible for Aaron's to achieve the financial results described by Defendants, because the Company was unable to assess customer creditworthiness and pursue collections.

21.     On July 24, 2015, the Company held its earnings conference call for the second quarter of 2015, and it maintained its previous revenue guidance for Progressive and raised the Company's adjusted EPS guidance to the range of $2.15 to $2.35 based on the success of Progressive.  Robinson continued to highlight Progressive's success, stating, "Progressive continues to exceed our expectations.

Revenues and margins improved significantly. Our product is clearly resonating . . . . we believe we have the industry-leading, virtual lease-to-own solution in the market."

22.    The statements and omissions set forth in ¶21 were materially false and misleading.  In truth, the loss of critical data undermined Progressive's proprietary decision-making software, the same software that Aaron's senior executives emphasized as what was distinguishing Progressive in the virtual rent-to-own business.

## DISCLOSURES OF COMPANY'S MISCONDUCT CAUSE MASSIVE INVESTOR LOSSES

23.    On October 30, 2015, the Company disclosed that Progressive had lost two critical data feeds in February 2015, which affected the Company's ability to make loans and collect payments.  The Company announced it was lowering its full-year guidance as it had "experienced higher bad debt expense and merchandise write offs due to a temporary interruption of certain data attributes we use to approve leases, as well as software issues that delayed our ability to identify and begin collections on certain delinquent accounts."

24.    When questioned as to when the software problems surrounding Progressive began, Woodley clarified that the Company discovered the problems in

February, stating, "[w]e discovered the issues -- of course, we knew we had lost the data and developed a plan to replace it in February and March and it was replaced in April." CEO Robinson reiterated, stating, "[w]e lost access to the attributes in February 2015 and replaced them in April 2015."

25.    An analyst report issued by BB&T Capital Markets called the Company's dissapointing quarter "stunning" and went on to state that the analysts "were particularly troubled by Progressive's technology issues" and "were very surprised Progressive could allow 'mission critical' functions . . . . to be at risk to third party provider data changes and faulty software code.  We believe these errors call into question Progressive's long-term growth prospects."

## LOSS CAUSATION

26.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of Aaron's common stock and operated as a fraud or deceit on the Class.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on October 30, 2015, the price of Aaron's common stock fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of Aaron's common

stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the common stock of Aaron's during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Aaron's and their families and affiliates.

28.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of July 31, 2015 Aaron's had over 70 million shares outstanding, owned by hundreds or thousands of investors.

29.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

       (a)     Whether Defendants violated the Exchange Act;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)     Whether the price of Aaron's common stock was artificially inflated;

(f)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)     The extent of damage sustained by Class members and the appropriate measure of damages.

30.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

31.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

32.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

33.    Aaron's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

34.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Aaron's who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

35.   At all relevant times, the market for Aaron's common stock was an efficient market for the following reasons, among others:

(a)   Aaron's common stock met the requirements for listing, and were listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)   As a regulated issuer, Aaron's filed periodic public reports with the SEC and the New York Stock Exchange;

(c)   Aaron's regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Aaron's was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

36.     As a result of the foregoing, the market for Aaron's common stock promptly digested current information regarding Aaron's from all publicly available sources and reflected such information in the price of Aaron's common stock.  Under these circumstances, all purchasers of Aaron's common stock during the Class Period suffered similar injury through their purchase of Aaron's common stock at artificially inflated prices and the presumption of reliance applies.

37.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Aaron's data loss—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Progressive's business, as set forth above, that requirement is satisfied here.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Against All Defendants**

38.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

39.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Aaron's common stock at artificially inflated prices.

40.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Aaron's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

41.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged

and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

42.    During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

43.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants engaged in this misconduct to conceal Aaron's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

44.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Aaron's common stock.  Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Aaron's common stock had been artificially inflated by Defendants' fraudulent course of conduct.

45.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

46.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

47.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

48.     The Individual Defendants acted as controlling persons of Aaron's within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Aaron's, the Individual Defendants had the power and ability to control the actions of Aaron's and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.      Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: June 16, 2017

/s/ Michael A. Caplan

**CAPLAN COBB LLP**
 Michael A. Caplan

Georgia Bar No. 601039
75 Fourteenth Street, N.E.
Atlanta, Georgia 30309
Telephone: (404) 596-5610
Facsimile:  (404) 596-5604
mcaplan@caplancobb.com

*Liaison Counsel for Plaintiff
Employees' Retirement System of the
City of Baton Rouge and Parish of
East Baton Rouge*

**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
Avi Josefson
(*pro hac vice* forthcoming)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444
jerry@blbglaw.com
avi@blbglaw.com

*Counsel for Plaintiff Employees'
Retirement System of the City of Baton
Rouge and Parish of East Baton Rouge*