**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| *In re Aaron's, Inc. Securities Litigation* | Civil Action No. 1:17-cv-02270-SCJ<br><br>CLASS ACTION<br><br>**CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ....... 2

II. JURISDICTION AND VENUE ....... 12

III. THE PARTIES ....... 13

A. Lead Plaintiff ....... 13

B. Defendants ....... 14

1. Aaron's ....... 14

2. The Individual Defendants ....... 14

IV. SUMMARY OF THE FRAUD ....... 17

A. Aaron's Is a Rent-to-Own Business for Low-Income Customers ....... 17

B. Stagnant Results at Aaron's Stores Prompted Aaron's to Analyze Its Strategic Alternatives ....... 20

C. In April 2014, Aaron's Rejected the Lucrative Buyout Offer and Announced Its Acquisition of Progressive ....... 21

D. Progressive Relies on Its Algorithm to Make Accurate Underwriting Decisions without Face-to-Face Interactions ....... 26

E. Aaron's Begins Using the Progressive Algorithm ....... 28

F. Aaron's Reports Rapid Growth at Progressive while Concealing the Serious Problems with the Progressive Algorithm ....... 29

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ....... 31

A. February 2015 ....... 33

B. March 2015 ....... 41

C. April 2015 ........................................................................................48

D. May 2015 ..........................................................................................66

E. July 2015 ...........................................................................................70

F. August 2015 ......................................................................................84

G. September 2015 ................................................................................89

VI. THE TRUTH EMERGES ........................................................................92

VII. ADDITIONAL ALLEGATIONS OF SCIENTER ..................................101

VIII. LOSS CAUSATION ...........................................................................111

IX. PRESUMPTION OF RELIANCE .........................................................114

X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ..............115

XI. CLASS ACTION ALLEGATIONS ........................................................117

CAUSES OF ACTION ...............................................................................120

COUNT I ..................................................................................................120

COUNT II .................................................................................................123

PRAYER FOR RELIEF ..............................................................................123

JURY TRIAL DEMAND .............................................................................124

Lead Plaintiff Arkansas Teacher Retirement System ("ATRS" or "Lead Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, *inter alia*, an investigation by its counsel, which has included the review and analysis of: (a) regulatory filings made by Aaron's, Inc. ("Aaron's" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by the Company; (c) analyst reports concerning Aaron's; and (d) other public information regarding the Company. Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control.

Lead Plaintiff brings this action on behalf of itself and all persons and entities who purchased or otherwise acquired Aaron's common stock between February 6, 2015 and October 29, 2015, inclusive (the "Class Period"). ATRS asserts claims against Aaron's and its senior Company executives who made materially false and misleading statements to investors during the Class Period (collectively, "Defendants"). The Class's claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated

thereunder by the SEC.

## I. INTRODUCTION

1. This securities fraud class action arises from Defendants' materially false and misleading statements and omissions to investors about the benefits of Progressive's lease underwriting algorithm to Aaron's business, the functionality of that algorithm, and the Company's financial state.

2. Aaron's is a retailer of furniture, consumer electronics, and other merchandise that offers flexible payment options for credit-challenged individuals. Historically, Aaron's predominantly operated as a rent-to-own ("RTO") brick-and-mortar retail business, which allows customers to lease products in exchange for a weekly or monthly payment, with the option to purchase the products during the term of the lease. Aaron's customer base is comprised primarily of consumers with limited access to traditional credit sources such as bank financing, installment credit, or credit cards.

3. Progressive is a "virtual" RTO company that, like Aaron's, offers lease-purchase solutions to credit-challenged retail customers. Unlike Aaron's, however, Progressive does not operate any retail stores. Instead, Progressive purchases requested merchandise from third party stores and then leases the merchandise to the customer.

4. Businesses like Aaron's and Progressive, which have credit-challenged customer bases, thrive by distinguishing between those customers to whom it is too dangerous to extend credit and those who may have had problems in the past but are able to pay high interest rates without defaulting. Indeed, accurately assessing a customer's ability to pay and timely identifying delinquent accounts are, in the words of one analyst, "mission critical" functions for Aaron's.

5. On or about February 10, 2014, after years of struggling to adapt in an RTO space that had been transformed by the internet and virtual marketplace, Aaron's received an unsolicited offer from one of its largest shareholders (Vintage Capital Management) to acquire all of Aaron's outstanding shares for $30.50, a 12.8% premium over the then-current price.

6. Subsequent to Vintage's offer, on April 15, 2014, Aaron's announced in an Open Letter to its Shareholders that, at this major "inflection point" in the Company's history, Aaron's was rejecting Vintage's lucrative offer and instead acquiring Progressive's virtual RTO business for $700 million. Aaron's described its acquisition of Progressive as a "strategically transformational" move that would grow the Company into an omni-channel lease purchase provider.

7. Aaron's specifically claimed that the acquisition of Progressive provided it with a key advantage over other RTO companies: a proprietary

decisioning algorithm (the "Progressive algorithm" or "algorithm"), which Progressive used to automatically assess customers' ability to pay and make underwriting decisions. According to Defendant Woodley, the CEO of Progressive, the algorithm allows Progressive to "deliver the highest sustainable approval rate and highest sustainable conversion rate"[1] because it can be adjusted in real-time in response to changes in market conditions.

8. Obtaining access to the algorithm was of particular interest to Aaron's. Indeed, Aaron's has repeatedly stated in its public filings that "Progressive's proprietary, centralized underwriting process" was "***a key to the success*** of the Progressive business." As Defendant Michaels, the then-President of Aaron's stated on April 15, 2014, when announcing the acquisition, Progressive would "improv[e] our in-store customer experience by using the decision engine" and expand deeper into the "unbanked" and "underbanked" consumer retail segment.

9. Aaron's and Progressive presented the acquisition as a win for Progressive as well. According to Aaron's, a key advantage it has over brick-and-mortar competitors is its leading nationwide footprint, which purportedly gives

---

[1] "Conversion rate" is the percentage of prospective customers who take a specific, desired action, such as the percentage of website visitors who fill out a form or make an online purchase during their visit. In the retail context, conversion rate measures the proportion of visitors to a retail outlet who make a purchase.

Progressive the ability to utilize the Aaron's store network to "expand the market to the unbanked." In addition, Progressive purportedly could leverage Aaron's collections infrastructure to decrease its bad debt expense and merchandise write-offs, and thus improve its earnings margins. Michaels in fact stated during the April 15, 2014 conference call that "there is no doubt in our minds that both Aaron's and Progressive are better together than as separate companies."

10. Market analysts greeted the acquisition enthusiastically, writing that Progressive "provides Aaron's access to the fast-growing 'virtual' RTO space," that Progressive will act as a "perceived catalyst for growth that has been absent for the previous few years," and that Progressive should offer "a growth outlet while [Aaron's] core operations continue to struggle."[2]

11. During the Class Period, after having banked Aaron's future on Progressive's technology, Defendants repeatedly touted the benefits and performance of the Progressive algorithm. For example, in February 2015, Defendant Robinson, CEO of Aaron's, told investors that Aaron's technology (which by this time had long included the Progressive algorithm) purportedly "uniquely" positioned Aaron's to execute on its omni-channel strategy. Defendants

[2] "Core operations" in this context refers to Aaron's traditional RTO operations.

Aaron's and Robinson also lauded Progressive's "strong" "invoice volume growth,"[3] which purportedly was "driven" by "existing retail doors" and "new doors" where the "Progressive platform" had been rolled out. Defendant Woodley also told investors in February 2015 that the Progressive algorithm was a competitive advantage over Progressive's virtual RTO competitors because the Company adjusted it in real-time in response to changes in market conditions, and because Progressive saw the positive impact of those adjustments in the performance of its lease pools.

12. Similarly, in April 2015, Defendants told investors that during the first quarter of 2015, Progressive's virtual RTO segment continued to deliver solid profitability and that its lease portfolio performance remained "stable" even as Aaron's rapidly introduced the Progressive algorithm to new retail locations, including at Aaron's stores. Defendants continued to tell investors that Progressive was able to deliver the highest sustainable lease approval rate because it constantly improved its underwriting algorithm; remained focused on product and process innovation; had invested in technology; was maintaining its decisioning discipline; and had minimized bad debt expense and merchandise write-offs. Aaron's also

---

[3] "Invoice volume" is the dollar value of merchandise that Progressive purchases from retailers.

raised its financial guidance for the full year 2015 including its outlook for Progressive's lease revenues and EBITDA.

13. In July 2015, Defendants once again praised Progressive's "strong lease portfolio performance," increased profitability, and "improved collection metrics." Defendants also repeated their commitment to invest in technology, particularly as they expanded the introduction of the Progressive algorithm in Aaron's stores nationwide. Defendant Robinson announced that Aaron's was, for the second time, "raising our EBITDA and EPS outlook for 2015 to reflect … stronger trends in Progressive."

14. However, unbeknownst to investors, at the beginning of the Class Period—in February 2015—Aaron's had discovered serious technical problems involving the Progressive algorithm that made these statements, and the others described below, materially false and misleading when made.

15. Specifically, as Defendants have since admitted, Aaron's had discovered in February 2015 that the Progressive algorithm had lost access to critical data feeds, and, as a result, during an extended ten-week period, was unable to accurately determine its customers' ability to pay—vastly increasing the danger that leases were mistakenly being entered into with risky customers. But rather than reduce or stop use of the algorithm until the missing data attributes were restored, or

disclose to the market that the algorithm was heavily reliant on non-redundant third party data feeds to which the Company had lost access, Defendants expanded the introduction of the algorithm at Aaron's stores and continued to tout the algorithm and its functionality to investors.

16. Defendants were on notice that the 10-week loss of the critical data feeds was having a negative financial impact on the Company because, after a reported decline in bad debt expense in the first quarter of 2015, Aaron's reported bad debt expense abruptly increased by ***26.5%*** in the second quarter of 2015, and bad debt expense as a percentage of revenues also increased in the second quarter of 2015.

17. Aaron's also experienced a separate, distinct problem that it further failed to disclose to investors. As Defendants have also now belatedly admitted, a software error in Progressive's lease management system also caused certain delinquent accounts to go undetected in the second and third quarters of 2015. According to Aaron's, the error was discovered in August 2015, and while the error was occurring, Progressive was unable to begin prompt collection activities on certain risky leases.

18. As a result of the foregoing, Defendants knew in February 2015 that the Progressive algorithm was not functioning correctly, knew that bad debt expense

was increasing during the second and third quarters of 2015, and knew by August 2015 at the latest that Aaron's had another software error and other previously-undetected non-performing leases.

19. Rather than promptly disclose these critically important technology flaws to investors as soon as they learned them or revise earnings guidance downward, Defendants simply hid the truth. From February through October 2015, Defendants said nothing to investors about the Company's loss of access to the data feeds or the other software problems and instead repeatedly praised the Aaron's and Progressive technology and raised financial guidance.

20. Indeed, even as late as September 22, 2015, the Company held a conference call with investors to "discuss the strategic expansion of its Progressive business." During the call, Defendant Robinson lauded "the strong and profitable growth of our Progressive business," but again said nothing about the known algorithm data outage, the other known software error, or the material negative impact on Progressive's earnings from these problems—even though the existence of the problems and the severity of their impact were well-known to the Company by that time.

21. Defendants' Class Period statements about, *inter alia*, the benefits of the Progressive algorithm, the lease portfolio, and the Company's financial

performance, were all materially false and misleading at the time they were made because these statements were made at a time when the Defendants knew or recklessly disregarded that Aaron's had increased its pool of high-risk customers likely to default.

22. The truth was finally revealed to the market on October 30, 2015, when Aaron's reported sharply disappointing financial results for the third quarter of 2015. During a conference call with investors, Defendant Robinson admitted that:

> Our February, March and April 2015 lease pools have performed worse than expected due to the temporary interruption of certain third-party data used in our decisioning algorithm.
>
> Due to this data loss, our lease pools in these months are experiencing higher write-offs than we expected.
>
> ***
>
> We also introduced new software code into our lease management system in the second and third quarters, which resulted in a number of accounts not being identified as being delinquent and affected our ability to begin prompt collection activities.

23. During the same call, Defendant Woodley admitted that he and others at Aaron's had discovered the data outage in February 2015, eight months before he disclosed it to investors. In Woodley's own words, "***We discovered the issues – of course, we knew we had lost the data and developed a plan to replace it in February and March***." Woodley also estimated that credit approval decisions on

"approximately 8% to 9% of applications over a 10-week period" were impacted by the data outage. He further stated that the Company "began to understand the impact to our financial statements in August [2015] when we discovered and began to remediate the software code issues." However, the Defendants knew throughout the second and third quarters of 2015 that Aaron's bad debt expense from its loans was rising sharply, and their failure to disclose the February-April 2015 data outage (including in the face of that known trend) was, at a minimum, severely reckless and materially misleading.

24. Analysts were stunned by these disclosures, with one challenging Defendant Woodley by asking "***what was the data, because obviously it was very important data that went missing?***" and "when did you find out it was not available to you anymore and why did you choose not to disclose that?... If the approval engine was lacking key data, why not cut back on approvals during that period until you got it sorted?" In response, Woodlye admitted that, "They were obviously more valuable elements for us in the scheme of the universe of the hundreds of variables that we do use."

25. On October 30, 2015, BB&T reported it was "***particularly troubled by Progressive's technology issues***," which "call into question Progressive's long-term growth prospects, which we think are core to the Aaron's buy thesis."

26. On November 2, 2015, SunTrust Robinson Humphrey reported on Aaron's that "***credibility is now an issue***" and that management was being criticized for "***untimely news dissemination***."

27. The market's reaction was also immediate and negative. After Aaron's released its October 30, 2015 earnings and made these disclosures, Aaron's stock price plummeted by $8.88 per share, from $33.55 to $24.67 per share, or by ***26.5%***, causing significant financial harm to investors. This was the second-largest percentage drop in Aaron's stock price since the Company went public in 1982. The October 30, 2015 closing price was also ***19%*** less than Vintage's $30.50 buyout offer, which Aaron's rejected when it instead bet its future on Progressive and its algorithm.

## II. JURISDICTION AND VENUE

28. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

29. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

30. Venue is proper in this District pursuant to Section 27 of the Exchange

Act and 28 U.S.C. § 1391(b). Aaron's maintains its U.S. headquarters in this District, and the acts and conduct that constitute the violations of law complained of herein, including the preparation and/or dissemination to the public of materially false and misleading information, occurred in this District. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. THE PARTIES

### A. Lead Plaintiff

31. ATRS is a public pension system that has been providing retirement benefits to Arkansas public school and education employees since 1937. ATRS manages approximately $15 billion in assets for the benefit of its members. As set forth in the Certification already filed with the Court (ECF No. 14-3), ATRS purchased common shares of Aaron's on the New York Stock Exchange ("NYSE") during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein. On September 19, 2017, this Court appointed ATRS as the Lead Plaintiff in this litigation (ECF No. 35).

## B. Defendants

### 1. Aaron's

32. Defendant Aaron's sells and leases-to-own furniture, consumer electronics and other merchandise. Aaron's is a Georgia corporation with its principal executive offices at 309 E. Paces Ferry Road, N.E., Atlanta, Georgia. Aaron's common stock trades under the ticker symbol "AAN" on the NYSE, which is an efficient market. Aaron's has over 70 million shares outstanding, owned by hundreds or thousands of investors.

### 2. The Individual Defendants

33. Defendant John W. Robinson III ("Robinson") is Chief Executive Officer of Aaron's. Prior to Robinson's November 10, 2014 appointment as Aaron's CEO, he was an Executive Vice President at Aaron's and the CEO of Aaron's subsidiary Progressive Leasing.

34. Defendant Steven A. Michaels ("Michaels") was, at all relevant times, President of Aaron's. On January 19, 2016, Aaron's announced its appointment of Michaels to replace Defendant Danielson as Aaron's Chief Financial Officer.

35. Defendant Ryan K. Woodley ("Woodley") is CEO of Aaron's subsidiary Progressive Leasing and has served in that role since January 2015.

36. Defendant Gilbert L. Danielson ("Danielson") was, at all relevant

times, CFO of Aaron's. Danielson left Aaron's on December 31, 2016 after Aaron's first announced his departure on January 29, 2016.

37. Defendants Robinson, Michaels, Woodley, and Danielson are collectively referred to hereinafter as the "Individual Defendants" and, together with Aaron's, the "Defendants."

38. Each of the Individual Defendants, by virtue of his high-level position with Aaron's, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition during his tenure with the Company, as alleged herein. As set forth below, the materially misstated information conveyed to the investing public was the result of the collective actions of these individuals. Each of these individuals, during his tenure with the Company, was involved in drafting, producing, reviewing, and/or disseminating the statements at issue in this case, approved or ratified these statements, or was aware but recklessly disregarded that these statements were being issued regarding the Company.

39. As executive officers of a publicly held company with common stock that was, and is, registered with the SEC pursuant to the Exchange Act, traded on

the NYSE, and governed by the federal securities laws, the Individual Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based on accurate information. The Individual Defendants each violated these requirements and obligations during the Class Period.

40. The Individual Defendants, because of their positions of control and authority as executive officers of Aaron's, were able to and did control the content of the SEC filings, press releases, and other public statements issued with copies of the statements at issue in this action before they were issued to the public and had the ability to prevent their issuance or cause them to be corrected. Accordingly, each of these individuals is responsible for the accuracy of the public statements detailed herein.

41. The Individual Defendants, because of their positions of control and authority as executive officers of Aaron's, had access to adverse undisclosed information about the Company's business, operations, financial statements, and internal controls through access to internal corporate documents, conversations with other Aaron's officers, directors, and employees, attendance at Company

management and Board of Directors meetings, and via reports and other information provided to them in connection therewith, and knew or recklessly disregarded that these adverse undisclosed facts and material risks rendered the positive representations made by or about Aaron's false and misleading.

42. The Individual Defendants are liable as participants in a fraudulent scheme or course of conduct that operated as a fraud or deceit on purchasers of Aaron's common stock by disseminating materially false and misleading statements and/or concealing adverse facts. The scheme: (i) deceived the investing public regarding the Company's products, business, operations, and management, and the intrinsic value of Aaron's common stock; and (ii) caused Lead Plaintiff and members of the Class to acquire Aaron's common stock at artificially inflated prices and suffer damages once the truth was revealed.

## IV. SUMMARY OF THE FRAUD

### A. Aaron's Is a Rent-to-Own Business for Low-Income Customers

43. Aaron's is a specialty retailer primarily engaged in the business of leasing and selling furniture, consumer electronics, computers, appliances, and household accessories throughout the United States and Canada. As of March 2015, Aaron's had 2,108 stores comprised of 1,326 Company-operated stores in 28 states, and 782 independently-owned franchised stores in 27 states and Canada.

44. Aaron's operates as a RTO business, which allows customers to lease products from Aaron's in exchange for a weekly or monthly payment, with the option to purchase the merchandise during the lease term.

45. Customers enter into leasing agreements with Aaron's for a predetermined period of months, and the agreements can be terminated either by voluntarily returning the leased merchandise, or by exercising an early purchase option. If a customer makes all monthly payments pursuant to his or her agreement with Aaron's, the customer takes ownership of the merchandise. If the agreement is instead properly terminated, no adverse credit action occurs.

46. The RTO industry is utilized primarily by low-income customers with little to no credit. Leasing, rather than purchasing, electronics and other household items enables customers to avoid the often burdensome up-front cost of purchasing these items while gaining instant access to the merchandise. This arrangement facially appeals to low-income and financially distressed individuals (although, over time, the customers end up paying significantly more than the retail price of the merchandise due to the high, and often predatory, interest rates that RTO companies charge). Indeed, in its presentations to investors, Aaron's describes itself as serving "both the unbanked and under-banked customer," and states that approximately 83% of lease-to-own customers fall into the $15,000-$50,000 per household income

range.

47. Aaron's borrower-base thus consists primarily of customers who would not otherwise be approved for credit. Aaron's in fact describes its customers in its March 2015 Form 10-K as those who are "credit challenged" and "therefore unlikely to have access to traditional credit-based financing options."

48. As a result, it is critical for Aaron's to understand the financial risk to which it is exposing itself when leasing merchandise to its low-income, "credit-challenged" customers, and to closely monitor its customers' payment history and delinquency rates.

49. At the beginning of the Class Period, during a February 6, 2015 conference call with investors to discuss fourth quarter 2014 earnings, Defendant Michaels, President of Aaron's, acknowledged the "continued headwinds faced by our consumers" and stated that "[c]ustomer payment and collection performance has certainly been a focus for us and for all companies serving a similar customer base." Defendants' claims concerning Aaron's capabilities to vet, and approve, customers were thus particularly material to investors.

50. Aaron's has also acknowledged the importance of timely cash collection in a RTO business, stating in its March 2015 Form 10-K that "timely cash collections" was a key success factor for Aaron's. The Form 10-K explained that

"[c]areful attention to cash collections is particularly important in sales and lease ownership operations, where the customer typically has the option to cancel the agreement at any time and each payment is considered a renewal of the agreement rather than the collection of a receivable."

### B. Stagnant Results at Aaron's Stores Prompted Aaron's to Analyze Its Strategic Alternatives

51. As Aaron's then-CEO Ron Allen told investors on February 7, 2014, "2013 was a challenging year in terms of revenue and profits." Aaron's brick-and-mortar business was stagnating, as growth in overall lease revenues, same-store revenues, and customer counts were much less than planned or expected. Management was under intense pressure from the market to improve operational and financial performance, and analysts were openly skeptical of management's ability to turn the Company around. For example, during an Aaron's earnings conference call on February 7, 2014 with analysts and investors to discuss the Company's full-year 2013 earnings, an analyst from Northstar Partners asked Aaron's then-CEO Allen:

> I am trying to understand, what should we – is the profitability of the business, the earnings power of the business – is the past no longer relevant? Or is there a road that we could see to getting back to that profitability?
>
> Because it is obviously a huge gap down, and I think it is something that despite your talking about your confidence

> in management, we don't know those people. ***We only can see the reported results, and they had been nothing but disappointing over the last 18 months***.
>
> So could you just talk about what the earning power of the business is, and what it is going to take to get it back to what it had been just two short years ago?

52. These questions, and others like them, took on added urgency because shortly before the earnings call on February 7, 2014, Aaron's received an unsolicited buyout offer from one of its largest shareholders (Vintage Capital Management), thereby placing additional pressure on Aaron's to revamp its core business. Vintage offered to purchase all of Aaron's outstanding shares for $30.50, which was an approximately 12% premium over the then-current trading price.

53. While, as discussed below, Aaron's ultimately rejected Vintage's lucrative offer, Aaron's knew that drastic action was required to contend with growing competition from virtual and online RTO platforms. That drastic action took the form of Aaron's $700 million acquisition of Progressive.

### C. In April 2014, Aaron's Rejected the Lucrative Buyout Offer and Announced Its Acquisition of Progressive

54. On April 15, 2014, Aaron's announced that it had rejected Vintage's offer and was acquiring Progressive for $700 million. In an open letter to shareholders, signed by then-CEO Allen and then-Chairman Defendant Robinson, Aaron's described the acquisition as "transformative" and further stated the

following:

> ***Aaron's business is at an inflection point***, resulting from an evolving competitive landscape, changes in technology and a challenging macroeconomic environment. To return to the growth and profitability that our shareholders have come to expect, Aaron's needed to reposition itself to face these challenges – and opportunities.
>
> ***
>
> Like many industries, the RTO space has been transformed by the internet and virtual marketplace. Aaron's Board and management team have been focused on leveraging our leading national footprint, and strong brand and market expertise to address the growing virtual RTO customer base. We understand that the transformation taking place in our market requires decisive action.
>
> Approximately one year ago, we first began discussions with Progressive, and today we announced the acquisition of the company for $700 million. From both an operational and financial standpoint, this is an excellent transaction for Aaron's shareholders.
>
> ***
>
> ***The Progressive acquisition is also strategically transformational and will strengthen our franchise.*** Progressive's relationships with some of the largest national retailers, including 40 of the top 100 and eight of the top 20 U.S. furniture and bedding retailers – such as Mattress Firm, Big Lots, Art Van Furniture and Sleepy's – will open at least 15,000 new doors as sources of revenue for Aaron's. ***Progressive also has a proprietary database and proprietary decision engine, which provides true scalability and room for margin improvement as it allows Aaron's to begin penetrating the estimated $24 billion***

> ***addressable market. The potential synergies that we could recognize are substantial – Progressive's profitable customer reach and virtual customer interaction, combined with leveraging Aaron's stores for pick-up, refurbishment and release of returned and repossessed merchandise, will be a powerful combination.***

55. Analysts praised Aaron's acquisition of Progressive, writing that Progressive should enable Aaron's to grow while reinvigorating its "core" brick-and-mortar store business:

- On April 16, 2014, Canaccord Genuity reported that: "We believe the transaction provides [Aaron's] a growth outlet while core operations continue to struggle."
- Also on April 16, 2014, BB&T reported that: "Aaron's continues to face top line pressure from a weak consumer and a changing competitive dynamic, which has exacerbated investor concern about the next growth catalyst," and "[t]o address these concerns, the company acquired Progressive Finance Holdings, which provides Aaron's access to the fast-growing 'virtual' RTO space…. [T]his acquisition provides Aaron's with the perceived catalyst for growth that has been absent for the previous few years."
- On April 21, 2014, Gilford Securities reported that: "Progressive Finance acquisition enters Aaron's into the online rent-to-own channel and should drive substantial growth in the coming years."

56. Analysts also specifically emphasized that Progressive's "biggest asset" was its decisioning algorithm. For example:

- On April 17, 2014, Northcoast Research reported that:

"Progressive's value proposition for its retail partners is the fact that it can 'save the sale' for those customers that get turned down for more traditional credit programs. . . . The company's proprietary underwriting system (***likely its biggest asset***) can automatically decision 96% of the applications instantly via an algorithm that scans 500 unique attributes related to credit risk – none of which are FICO scores – as part of the application process."

- On April 25, 2014, KeyBanc also reported that: When "a customer is turned down, they can apply electronically with Progressive. The process is completely paperless, offering a quick and efficient process (either through an online portal or direct link integration with the retailer's POS system). . . . [M]angement believes the acquisition will allow [Aaron's] to: quickly and efficiently enter the large and growing kiosk market; expand its customer base; [and] ***utilize Progressive[']s approval process***, automated payment processing capabilities, and call center."

57. In tandem with the Progressive acquisition, Aaron's announced its plan to stabilize and improve its core business. The plan focused on, among other things, enhancing Aaron's online platform and integrating the Progressive algorithm into Aaron's business model.

58. Even after the acquisition was announced, and throughout the Class Period, analysts continued to comment on the importance of the Progressive algorithm to Progressive and Aaron's. For example:

- On February 9, 2015, Northcoast Research reported that: "We were pleased to learn that Progressive is investing R&D dollars to enhance its proprietary decision making engine in order to integrate the system into the company's corporate stores, with

the future goal of tapping into the 'unbanked' customer pool. The latter should expand the segment's long-term EBIT contribution. . . . The e-commerce program which utilizes Progressive's dynamic decision making process is currently live in approximately one-third of the retailer's markets with the plan to be fully deployed before the summer of 2015."

- On April 27, 2015, Stephens reported that: "Despite the impressive lease portfolio growth, performance has remained stable as write-offs decreased 10 bps YoY to 6.4%. We believe this is a testament to the ***industry leading underwriting and servicing capabilities of Progressive***. . . . ***We believe this an attractive opportunity for [Aaron's] to leverage Progressive's decision engine*** as Aarons.com currently generates ~20 mil. visitors annually, traffic which is not being effectively monetized."

- On June 22, 2015, KeyBanc Capital Markets, in a section discussing factors that management points to as providing insulation from competition, reported that: "Over the past decade, ***Progressive has developed invaluable experience when deciding whether or not to approve potential customers***. The Company has looked at hundreds (if not thousands) of datapoints to determine which are the most important when making approval decisions. Management continues to make small tweaks to improve its ***automated decision-making engine***."

- On June 24, 2015, Northcoast Research reported that: "***We think the market is underestimating the opportunity that Aaron's has to leverage Progressive's dynamic decisioning engine to launch a highly productive e-commerce platform***, and capture the potential windfall of servicing customers that it was not effectively reaching via its network of legacy brick-and-mortar stores. . . . Historically, Aaron's has been unable to monetize any of the traffic to its website, which currently attracts approximately 20 million unique visitors per year (implies nearly 10,000 per store in the network). We believe this shortfall was clearly evident to management when they were contemplating

> acquiring Progressive in early 2014. In fact, *we think the team recognized* ***the potential opportunity to leverage Progressive's dynamic decisioning engine to build a fully operational e-commerce platform to turn these unique visits into actual customers and deliveries as a real tangential benefit of any deal***."

**D. Progressive Relies on Its Algorithm to Make Accurate Underwriting Decisions without Face-to-Face Interactions**

59. Historically, the leasing approval process at Aaron's brick-and-mortar stores was paper-based and involved face-to-face interactions. Applicants were required to fill out an application and provide proof of address and employment, their employment history, their social security number, their bank account information, and their monthly lease payments. General Managers were required to review all the paperwork, have an in-depth conversation with the applicants, assess the totality of the interaction, and formulate a decision. This process helped managers and applicants to develop a rapport and helped managers understand, based on face-to-face interactions, if the applicants were truly qualified.

60. Progressive, in contrast, requires no such face-to-face interaction. Rather, customers seek credit approval through cash register or point of sale systems, or through electronic kiosks. Progressive relies on its proprietary algorithm—which purportedly considers hundreds of variables and attributes—to determine a customer's ability to pay and make underwriting decisions. Progressive thus

"virtualizes" the RTO experience and offers it directly in a retailer's location.

61. In a given transaction, Progressive purchases the requested merchandise from the third party retailer and leases it to the customer. This allows Progressive to do business without the cost of physical brick-and-mortar stores, with customers gaining access to the merchandise and the retailer completing the sale even if the customer does not qualify for credit through other traditional channels. As Aaron's stated in its March 2015 Form 10-K, Progressive offers "a technology-based application and approval process that does not require Progressive employees to be staffed in a store."

62. Customers can apply for approval through a Progressive "waterfall" application that is integrated into the retailer's cash register or other point of sale system and collects information there. If the consumer cannot qualify for financing through the store's bank, the program will automatically "waterfall" the consumer to Progressive, which then offers the customer leasing if they qualify. As discussed above, once the customer is approved, Progressive will purchase the merchandise from the retailer and structure a lease-to-own agreement with him or her.

63. This approach, however, potentially leaves Progressive with a pool of higher-risk customers in the subprime area of financing. The accuracy and reliability of the algorithm to identify the appropriate customers was thus material to

Progressive's and Aaron's business.

### E. Aaron's Begins Using the Progressive Algorithm

64. After acquiring Progressive, Aaron's quickly set about introducing the Progressive algorithm at its stores and online. On July 25, 2014, Defendant Michaels announced:

> [W]e are extremely pleased with an e-commerce pilot program which we have been developing over the last few months…. This pilot program is an important practical step in our efforts to build and test the functionality of our e-commerce platform. We will continue to build on key findings in technology, logistics, marketing, merchandising, and accounting. Transforming Aaron's online will take time, though. And while we don't expect the revenue and earnings contribution from the online business to be substantive in 2014 we believe it will be a key revenue driver in years to come.

65. Three months later, on October 24, 2014, Defendant Michaels further reported that the roll out of the Progressive algorithm continued apace:

> [W]e recently launched a second phase of our e-commerce pilot program, broadening both our product offering and our target audience, and are extremely pleased with its results. Using the learnings from our pilot programs as well as the technology and expertise of the Progressive team, we are preparing for a wider online experience for Aaron's online in time for Black Friday and Cyber Monday.

Despite these efforts, Michaels acknowledged that "there's still work to be done to turn around Aaron's core business, but as you can see we have a series of both near

and long-term initiatives to drive revenue growth. We expect to see – to start seeing a positive impact from these efforts over the coming quarters."

### F. Aaron's Reports Rapid Growth at Progressive while Concealing the Serious Problems with the Progressive Algorithm

66. In contrast with Aaron's efforts to reshape its core business, Progressive reported rapid growth after the acquisition, generating reported revenues of $138.9 million in the second quarter of 2014, up from $95 million in the second quarter of 2013. During the third quarter of 2014, Progressive further increased reported revenues to $189.8 million, recording a pre-tax profit of $1.4 million since the acquisition. During a call to discuss Aaron's third quarter 2014 earnings, Defendant Robinson described Progressive's performance as "excellent," stating that Progressive had beaten both its revenue and EBITDA guidance for the quarter. Robinson added that invoice volume for the third quarter had increased 80% year-over-year.

67. Equally important, though, were Progressive's ongoing efforts to integrate with Aaron's. When Aaron's announced the Progressive acquisition, Aaron's touted the benefits that its national footprint and collections infrastructure could provide Progressive. During the October 24, 2014 call, Defendant Robinson provided an update on the integration process:

> We are also pleased with our progress in terms of our

> integration with Aaron's. As we have discussed previously, we believe there is significant opportunity for Aaron's to help Progressive improve our returns process and customer retention efforts. We have been piloting a new process with Aaron's in a couple of markets over the past few months, but we are working to streamline it. We are very pleased with our results thus far, both in terms of saving customer relationships as well as picking up and releasing merchandise from customers who choose to return it to us.
>
> Aaron's physical store presence is a huge asset for Progressive and our retail partners as it will ultimately enable us to serve more customers.

68. In short, as the Company approached the start of the Class Period in February 2015, Progressive was, in the words of Defendant Danielson in an October 24, 2014 press release, "exceeding expectations and … rapidly growing its business." Subsequent undisclosed events, however, which Defendants failed to timely disclose, sharply impeded Progressive's performance.

69. In February 2015, Aaron's discovered that the Progressive algorithm had lost access to critical data feeds, and, as a result, during an extended ten-week period, was unable to accurately determine customers' ability to pay—vastly increasing the danger that Aaron's was mistakenly entering into leases with particularly risky or fraudulent customers. But rather than reduce or stop use of the algorithm until the missing data attributes were restored, or disclose to the market that the algorithm was heavily reliant on non-redundant third party data feeds to

which it had lost access, Defendants expanded the introduction of the algorithm at Aaron's stores.

70. In addition, a software error in Progressive's lease management system caused certain delinquent accounts to go undetected in the second and third quarters of 2015. Because the error was (according to Aaron's) not discovered until August 2015, Progressive was unable to begin prompt collection activities on certain risky leases that were delinquent during the spring and summer of that year.

71. As a result, Defendants knew in February 2015 that the Progressive algorithm was not functioning correctly and knew by August 2015 at the latest that the Company had a software error and increased bad debt expense and merchandise write-offs resulting from their technical problems.

72. Rather than promptly disclose these facts to investors or revise earnings guidance downward, Defendants made the series of materially false and misleading statements set forth below in Part V.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

73. Throughout the Class Period, Defendants Aaron's, Robinson, Woodley, Michaels, and Danielson made materially false and misleading statements and omissions to investors about the benefits and operations of the Progressive algorithm and about the Company's financial state, including by issuing bullish

earnings guidance and reporting understated write-off percentages and bad debt expense. Driven by the need to portray the Progressive acquisition as a success, Defendants repeatedly lauded the benefits of the Progressive algorithm and Progressive's collections capabilities, which they claimed had improved since Aaron's acquired Progressive.

74. But even as these Defendants praised Progressive and specifically its underwriting technology, they knew or recklessly disregarded, and failed to disclose, that: (i) beginning in February 2015, the Progressive algorithm lost access to critical data feeds and, as a result, over an extended ten-week period, did not make accurate decisions about customers' ability to pay, resulting in the approval of transactions about which Progressive lacked full information; (ii) the leases approved by the algorithm during the ten-week outage had significantly higher rates of default; (iii) a software problem in Progressive's lease management system software prevented the Company from timely identifying delinquent leases and initiating collections activities in the second and third quarters of 2015; and (iv) as a result of each of the foregoing, Aaron's consolidated EBITDA and Progressive's EBITDA for the second half and full year 2015, as well as the Company's write-offs and bad debt expense, were materially negatively impacted.

75. In fact, even as these events occurred, Defendants expanded the

introduction of the Progressive algorithm at Aaron's stores and ***increased*** Progressive EBITDA guidance ***twice*** during the Class Period. Set forth below are the materially false or misleading statements that Defendants made to conceal, *inter alia*, the material loss of data access and the serious financial risk posed by the leases underwritten during the ten-week data outage.

**A. February 2015**

76. On February 6, 2015, Aaron's issued a press release in which it announced its fourth quarter 2014 financial results (the "February 6, 2015 Press Release"). That same day, the Company filed with the SEC a Form 8-K, signed by Defendant Danielson, attaching the February 6, 2015 Press Release as an exhibit (the "February 6, 2015 Form 8-K").

77. In the February 6, 2015 Press Release and the February 6, 2015 Form 8-K, Defendants Aaron's, Danielson and Robinson made materially false and misleading statements concerning Aaron's technology, which by this time incorporated the Progressive algorithm. The February 6, 2015 Press Release quoted Defendant Robinson as stating:

> As we look at Aaron's today, we believe we have the right blend of assets to grow the Company into a truly ***omni-channel lease purchase provider***. Aaron's people, ***technology***, brand, customer base, retail relationships, store footprint, distribution network, and manufacturing ***capabilities uniquely position us to execute this strategy***.

78. These statements were materially false and misleading when made. Once Defendants Aaron's, Danielson and Robinson chose to speak about how Aaron's technology (which as of this time included the Progressive algorithm) purportedly "uniquely" positioned Aaron's to execute on its omni-channel strategy, they had a duty to disclose the then known or recklessly disregarded material negative facts that Aaron's had lost access to the critical data feeds on which the algorithm based its decisions and that the leases approved by the algorithm had a significantly higher probability of default.[4] The failure to disclose this information rendered these statements materially false and misleading because Aaron's loss of access to the data feeds significantly undermined Aaron's ability to "execute" on its "omni-channel strategy." Indeed, Defendants acknowledged during Aaron's

---

[4] When a defendant touts a specific fact to investors, the defendant has an affirmative duty to disclose all material adverse facts whose nondisclosure renders that statement materially false and misleading. *See SEC v. Merchant Capital, LLC*, 483 F.3d 747, 770-71 (11th Cir. 2007) (a duty to disclose all material information relating to particular subject arises by voluntarily "touting" the subject to investors); *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1043 (11th Cir. 1986) (same); "Where a defendant's failure to speak would render the defendant's own prior speech misleading or deceptive, a duty to disclose arises;" *In re Miller Indus., Inc.*, 120 F. Supp. 2d 1371, 1378 (N.D. Ga. 2000); *see also FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1298-99 (11th Cir. 2011) (finding that affirmative statements of present fact concerning the functionality of certain internal screening systems were materially misleading "because they could mislead a reasonable investor into believing that the Defendants had systems in place that would detect and remove distribution partners engaging in extensive fraudulent revenue-generating practices, when in truth and in fact they did not. To avoid being misleading, the Defendants' statements triggered a duty to disclose the grave defects that existed within the 'enforcement' system they voluntarily touted.").

October 30, 2015 Earnings Conference Call with investors that Aaron's knew about this data loss in February 2015 and that during the ten-week data outage, the algorithm was unable to accurately assess the ability of customers to pay—the key feature of the algorithm and a material reason that Aaron's acquired Progressive to embark on its omni-channel strategy. Rather than reduce or stop use of the Progressive algorithm until the missing data was restored, or disclose this defect to the market, Defendants tried to underwrite leases as usual and expanded the introduction of the Progressive algorithm. The omission of these material facts rendered the foregoing statements materially false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay.

79. Also on February 6, 2015, Aaron's held a conference call with investors to discuss its fourth quarter 2014 financial results (the "February 6, 2015 Earnings Conference Call"). During the February 6, 2015 Earnings Conference Call, Defendant Robinson again stated that:

> As we look at Aaron's today, we believe we have the right blend of assets to grow the Company into a truly ***omnichannel lease purchase provider***. Aaron's people, ***technology***, brand, customers, retail relationships, store footprint, distribution network, and manufacturing ***capabilities uniquely position us to execute this strategy***.

80. These statements were materially false and misleading when made for the same reasons set forth above in ¶78.

81. During the February 6, 2015 Earnings Conference Call, Defendant Robinson also stated that:

> … the growth of Progressive Leasing continues to be very strong driven by invoice volume growth from both existing retail doors as well as from new doors where the Progressive platform has been rolled out.

82. These statements were materially false and misleading when made. Once Defendants Aaron's and Robinson touted that Progressive's "strong" "invoice volume growth" was "driven" by "new doors" where the "Progressive platform" had been rolled out, they had a duty to disclose the then known or recklessly disregard facts that the Progressive algorithm was not functioning properly, that leases approved by the algorithm had a significantly higher probability of default, and that Aaron's was increasing invoice volume because it was approving leases through a defective process within the "Progressive platform." Indeed, Defendants acknowledged during Aaron's October 30, 2015 Earnings Conference Call with investors that Aaron's knew about this data loss in February 2015 and that during the ten-week data outage, the algorithm was unable to accurately assess the ability of customers to pay—the key feature of the "Progressive platform." Rather than reduce or stop use of the Progressive algorithm until the missing data was restored,

or disclose this defect to the market, Defendants tried to underwrite leases as usual and expanded the introduction of the Progressive algorithm. The omission of these material facts rendered the foregoing statements materially false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay.

83. During the February 6, 2015 Earnings Conference Call, Defendant Woodley also made materially false and misleading statements to investors. Specifically, Woodley claimed that the Progressive algorithm was a competitive advantage over its virtual RTO competitors:

> What differentiates our model is ***our centrally-automated decision algorithms that allow underwriting changes to be made in real-time***. Consistent with past practices, we've ***made slight adjustments to the algorithm*** in response to market conditions and are seeing the positive impact of those adjustments flow through the performance of our leasing pools.

84. These statements were materially false and misleading when made. Once Defendants Woodley and Aaron's chose to speak about the "centrally-automated decision algorithms," they had a duty to disclose the then known or recklessly disregarded material negative facts that Aaron's had lost access to the critical data feeds to the algorithm and that the leases approved by the algorithm had

a significantly higher probability of default. Indeed, Defendants acknowledged during Aaron's October 30, 2015 Earnings Conference Call with investors that Aaron's knew about this data loss in February 2015 and that during the ten-week data outage, the algorithm was unable to accurately assess the ability of customers to pay—the key feature of the "centrally-automated decision algorithms." Rather than reduce or stop use of the Progressive algorithm until the missing data was restored, or disclose this defect to the market, Defendants tried to underwrite leases as usual and expanded the introduction of the Progressive algorithm. The omission of these material facts rendered the foregoing statements materially false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay. In addition, Woodley's claims that Aaron's was making "real-time" underwriting changes and "slight adjustments to the algorithm" were false and misleading because, as Defendants later admitted, by February 2015 the Company knew it had lost access to the critical data feeds for the Progressive algorithm. Without those data feeds, Aaron's either could not make "underwriting changes" or "slight adjustments" to the algorithm; or if it could, those changes and adjustments were not properly executed, and there was in fact a negative impact, rather than a "positive

impact," flowing through the performance of Aaron's leasing pools.

85. During the February 6, 2015 Earnings Conference Call, Defendant Woodley also responded to an analyst's questions about Progressive's loan underwriting and how underwriting relates to when Aaron's charges off a transaction. Woodley stated that:

> … the model is designed to be dynamic. So, the beauty of the model is our ability to ***make changes at any time to the underwriting algorithm, which we do on an ongoing basis***.
>
> Any changes that were made weren't necessarily the only changes that were made to the algorithm. That's ***one of the attributes of the algorithm that we leverage continually*** to make sure that what we refer to as the pool – the curves, stay in line with where we'd like them to be.

86. These statements were materially false and misleading when made. Once Defendants Woodley and Aaron's chose to speak about Progressive's "underwriting algorithm," they had a duty to disclose the then known or recklessly disregarded material negative facts that Aaron's had lost access to the critical data feeds to the algorithm and that the leases approved by the algorithm had a significantly higher probability of default. Indeed, Defendants acknowledged during Aaron's October 30, 2015 Earnings Conference Call with investors that Aaron's knew about this data loss in February 2015 and that during the ten-week data outage, the algorithm was unable to accurately assess the ability of customers to pay—the

key feature of the "underwriting algorithm." Rather than reduce or stop use of the Progressive algorithm until the missing data was restored, or disclose this defect to the market, Defendants tried to underwrite leases as usual and expanded the introduction of the Progressive algorithm. The omission of these material facts rendered the foregoing statements materially false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay. In addition, Woodley's statements that Defendants were able to "make changes at any time to the underwriting algorithm, which we do on an ongoing basis," and that Defendants "continually" "leverage" the attributes of the algorithm to make sure "the curves stay in line with where we'd like them to be" were materially false and misleading because, as Defendants later admitted, by February 2015 the Company knew it had lost access to critical data feeds for the Progressive algorithm. Without those data feeds, Aaron's either could not "make changes at any time to the underwriting algorithm," or if it could, those underwriting changes would be inaccurate or improperly executed. For the same reasons, Aaron's could not "leverage" the algorithm and ensure that the "curves" "stay in line with where we'd like them to be."

87. In response to the foregoing materially false and misleading statements

and material omissions, Aaron's stock price increased $0.98 per share, or 3%, to close at $32.20 per share on February 6, 2015.

88. Analysts also reacted favorably to the Company's February 6, 2015 statements, stressing that the Company's growth was dependent on Progressive. For example, analysts at KeyBanc Capital Markets told investors on February 8, 2015:

> The Company reported strong 4Q results and issued positive 2015 guidance. Strength in the 4Q was largely driven by Progressive, which once again came in better than expected. ***Looking ahead, we remain positive on the outlook for Progressive, which has strong growth momentum and opportunities for profitability synergies with Aaron's.***

89. Analysts at Northcoast Research sounded similarly upbeat about Progressive. In its report dated February 9, 2015, a Northcoast analyst stated:

> Aaron's reported 4Q FY14 results last Friday that highlighted the rapid growth characteristics of the Progressive business and indicated that recent strategic initiatives are beginning to take hold amidst continued pressure on the core business. . . . ***Needless to say, we were happy to hear that Progressive's operations are running above plan, and we expect the momentum will continue in the coming quarters*** given the strong invoice volumes throughout 2014.

**B. March 2015**

90. On March 2, 2015, Aaron's filed with the SEC its Form 10-K, signed by Defendants Robinson, Woodley, Danielson, and Michaels, for the year ended

December 31, 2014 (the "2014 Form 10-K"). The 2014 Form 10-K made materially false and misleading statements to investors, including in its disclosure of material risk factors concerning the Progressive algorithm. In the 2014 Form 10-K, the Company disclosed that:

> ***Our Progressive business uses a proprietary underwriting algorithm to determine a customer's ability to pay***, which does not include traditional credit scoring. The transaction is completed through our online portal or through a point of sale integration with our retail partners. Contractual renewal payments are based on a customer's pay frequency and are typically originated through automated clearing house payments. ***If the payment is unsuccessful, collections are managed in-house through our proprietary lease management system. Customers are contacted within a few days of the lease payment due date to encourage them to keep their agreement current rather than return the merchandise***.
>
> ***
>
> Progressive's proprietary algorithm used to approve customers ***could*** no longer be indicative of our customer's ability to pay.
>
> We believe Progressive's proprietary, centralized underwriting process to be a key to the success of the Progressive business. We assume behavior and attributes observed on our prior customers, among other factors, are indicative of performance by future customers. Unexpected changes in behavior caused by macroeconomic conditions, changes in customer preferences, availability of alternative products or other factors, however, ***could*** lead to increased merchandise return incidence and costs and/or merchandise losses.

91. These statements were materially false and misleading when made. ***First***, at the time the 2014 Form 10-K was filed, Aaron's had already lost access to critical data feeds used by the Progressive algorithm to properly assess customers' ability to pay, and therefore, the algorithm was not in fact "indicative of our customers' ability to pay." Defendants' failure to disclose this loss of access renders these statements materially false and misleading. ***Second***, once Defendants Aaron's, Robinson, Danielson, Woodley, and Michaels chose to speak about the Progressive algorithm and the "proprietary, centralized underwriting process," they had a duty to disclose the then known or recklessly disregarded material negative facts that Aaron's had lost access to the critical data feeds to that proprietary algorithm and that the leases approved by the algorithm had a significantly higher probability of default. Indeed, Defendants acknowledged during Aaron's October 30, 2015 Earnings Conference Call with investors that Aaron's knew about this data loss in February 2015 and that during the ten-week data outage, the algorithm was unable to accurately assess the ability of customers to pay—the key feature of the Progressive algorithm. Rather than reduce or stop use of the Progressive algorithm until the missing data was restored, or disclose this defect to the market, Defendants tried to underwrite leases as usual and expanded the introduction of the Progressive algorithm. The omission of these material facts rendered the foregoing statements

materially false and misleading. The forgoing statements (including the statements' focus on how the algorithm used "behavior attributes observed on our prior customers") were also materially false and misleading for their failure to disclose that Aaron's was dependent on non-redundant third party data feeds when determining a customer's ability to pay. ***Third***, at the time of these Defendants' statements that Progressive's proprietary algorithm "could" no longer be indicative of customers' ability to pay, or unexpected events "could" lead to increased merchandise return incidence and costs, Defendants knew or recklessly disregarded and failed to disclose, that the foregoing material risks warned of in the 2014 Form 10-K had, in fact, already occurred.

92. The 2014 Form 10-K also provided the following risk disclosure related to the Company's information technology systems:

> ***If*** our information technology systems are impaired, our business ***could*** be interrupted, our reputation ***could*** be harmed and we ***may*** experience lost revenues and increased costs and expenses.
>
> We rely on our information technology systems to process transactions with our customers, including tracking lease payments on merchandise, and to manage other important functions of our business. Failures of our systems, such as "bugs," crashes, operator error or catastrophic events, ***could*** seriously impair our ability to operate our business. ***If*** our information technology systems are impaired, our business (and that of our franchisees) ***could*** be interrupted, our reputation could be harmed, we ***may*** experience lost

> revenues or sales and we ***could*** experience costs and expenses to remediate the problem.

93. The foregoing statements were materially false and misleading when made. At the time of these statements that "if" Aaron's technology systems were "impaired," this "could" lead to specific negative consequences, Defendants knew or recklessly disregarded that such risk—including impairments, failures or "bugs" in its information technology systems—had, in fact, already occurred. Defendants were already aware or recklessly disregarded that they had lost access to critical data feeds used by the Progressive algorithm to properly assess its customers' ability to pay. Once Defendants chose to speak about Aaron's information technology systems (which as of this time included the Progressive algorithm), they had a duty to disclose the then known or recklessly disregarded material negative facts that Aaron's had lost access to the critical data feeds on which the algorithm based its decisions and that the leases approved by the algorithm had a significantly higher probability of default. Indeed, Defendants acknowledged during Aaron's October 30, 2015 Earnings Conference Call with investors that Aaron's knew about this data loss in February 2015 and that during the ten-week data outage, the algorithm was unable to accurately assess the ability of customers to pay—the key feature of the Progressive algorithm. Rather than reduce or stop use of the Progressive algorithm until the missing data was restored, or disclose this defect to the market, Defendants

tried to underwrite leases as usual and expanded the introduction of the Progressive algorithm. The omission of these material facts, and Defendants' failure to correct and update this risk disclosure as further impairments became known, rendered the foregoing statements materially false and misleading. The forgoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay.

94. The Defendants' foregoing statements in the 2014 Form 10-K were further materially false and misleading because, in misrepresenting the capabilities and functional status of the Progressive algorithm, Defendants concealed that the leases that were approved during the ten-week data outage had a significantly higher probability of default. As such, Defendants failed to disclose (1) material events, trends and known uncertainties that were reasonably likely to have a material adverse effect on Aaron's results and operations in violation of the disclosure requirements set forth in Item 303;[5] and (2) significant, then-exiting (as opposed to

[5] Item 303 of Regulation S-K, 17 CFR 229.303, states in pertinent part that in its periodic reports to the SEC, a company is to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a materially favorable or unfavorable impact" on the company. Guidance provided by the SEC on Item 303 clarifies that disclosure is necessary where a "trend, demand commitment event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations."

potential) factors that made Aaron's securities more speculative or risky than the Company disclosed in violation of the disclosure requirements set forth in Item 503.[6]

95. In a March 6, 2015 presentation to investors, Aaron's described Progressive's algorithm as a "[p]roprietary automated decision system developed over several years" that "[u]tilizes customer application data enriched with attributes from third-party datasets."

96. The statement that Progressive's algorithm utilized "customer application data enriched with attributes from third-party datasets" was materially false and misleading because, in reality, and as Defendants disclosed in its public filings after the end of the Class Period, the Progressive algorithm was dependent on ***non-redundant*** third-party data feeds when determining customers' ability to pay and had, as of the time of this March 6, 2017 presentation lost access to critical "third-party data sets." As a result, the Progressive "decision system" was not "enriched" with the "third-party datasets" that Aaron's was touting to investors in this presentation. Further, once Defendants chose to speak about the "proprietary

---

[6] Item 503 of Regulation S-K Item 503(c), 17 CFR 229.503, requires disclosure of the most significant or principal factors that make an investment in a registrant's securities speculative or risky. Additionally, Item 503(c) directs registrants to explain how each risk affects the company and discourages disclosure of risks that could apply to any registrant. Guidance provided by the SEC on Item 303 clarifies that companies should avoid "boiler plate" risk factors, and that a discussion of risk in purely generic terms does not indicate how a risk may affect an investment in a particular registrant.

automated decision system" they had a duty to disclose the then known or recklessly disregarded material negative fact that Aaron's had lost access to critical data feeds used by the Progressive algorithm to properly assess customers' ability to pay and that the leases approved by the algorithm had a significantly higher probability of default. Indeed, Defendants acknowledged during Aaron's October 30, 2015 Earnings Conference Call with investors that Aaron's knew about this data loss in February 2015 and that during the ten-week data outage, the algorithm was unable to accurately assess the ability of customers to pay—the key feature of the Progressive algorithm. Rather than reduce or stop use of the Progressive algorithm until the missing data was restored, or disclose this defect to the market, Defendants tried to underwrite leases as usual and expanded the introduction of the Progressive algorithm. The omission of these material facts rendered the foregoing statement materially misleading.

**C. April 2015**

97. On April 24, 2015, Aaron's issued a press release in which it announced its first quarter 2015 financial results (the "April 24, 2015 Press Release"). On the same day, Aaron's filed with the SEC a Form 8-K which was signed by Defendant Danielson and attached the April 24, 2015 Press Release as an exhibit (the "April 24, 2015 Form 8-K"). In the April 25, 2015 Press Release and the April 24, 2015

Form 8-K, the Company stated that Aaron's was "Rais[ing] 2015 Guidance on Strength of Progressive Business" and updated "its guidance for the full year 2015 to increase its outlook for Progressive's lease revenues and EBITDA." The Company projected the following:

> **Progressive**
>
> EBITDA is expected to be in the range of $105 million to $115 million compared with the previous guidance of $95 million to $105 million.
>
> **Consolidated Results**
>
> EBITDA expectations are being increased to a range of $305 million to $335 million compared with the previous guidance of $295 million to $325 million.

Also on April 24, 2015, the Company held a conference call with investors to discuss its first quarter 2015 earnings (the "April 24, 2015 Earnings Conference Call"). During that call, Defendant Robinson stated that the Company was "raising our outlook for the year" due to "***stronger trends in Progressive.***" Defendant Danielson echoed Robinson's comments, stating, "We are increasing our previously announced full-year 2015 guidance to reflect Progressive's strong results in the quarter."

98. These statements were materially false and misleading when made. ***First***, the projections lacked a reasonable basis because, rather than there being "stronger trends" or "strong results" at Progressive, the leases approved during Aaron's data feed outage were based on incomplete information and carried greater

risk of default, increased bad debt expense and charge-offs. ***Second***, these statements failed to disclose that earnings would in fact be negatively impacted by increases in charge-offs and bad debt expense. Defendants set forth these expectations with the knowledge, or reckless disregard of the fact, that the data feed outages resulted in a material increase in leases with a high likelihood of default, and consequential charge-offs. Indeed, on October 30, 2015, Defendants announced that they were reducing earnings guidance because of increased write-offs and bad debt expense, reducing Progressive's 2015 EBITDA guidance to a range of $103 million to $108 million, and reducing Aaron's consolidated 2015 EBITDA guidance to a range of $308 million to $328 million. ***Third***, once Defendants chose to speak about trends at Progressive they had a duty to disclose the then known or recklessly disregarded material negative fact that Aaron's had lost access to critical data feeds used by the Progressive algorithm to properly assess a customer's ability to pay and that the leases approved by the algorithm had a significantly higher probability of default. Indeed, Defendants acknowledged during Aaron's October 30, 2015 Earnings Conference Call with investors that Aaron's knew about this data loss in February 2015 and that during the ten-week data outage, the algorithm was unable to accurately assess the ability of customers to pay—the key feature of the Progressive algorithm. Rather than reduce or stop use of the Progressive algorithm

until the missing data was restored, or disclose this defect to the market, Defendants tried to underwrite leases as usual and expanded the introduction of the Progressive algorithm. The omission of these material facts rendered the foregoing statements false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay. Aaron's added this precise disclosure to its public filings only after the end of the Class Period.

99. Also in the April 24, 2015 Press Release, Defendant Robinson stated that "[a]t Progressive, we plan to add new doors to the system while ***maintaining our focus on product and process innovation*** to drive higher invoice value in existing retail locations."

100. Aaron's and Robinson's statements that Progressive was "maintaining . . . focus on product and process innovation" were materially false and misleading because at the time these statements were made, the Company's "product and process"—which included the Progressive algorithm—were not performing properly and were not enabling the Company "to drive higher invoice value." Once Defendants Aaron's and Robinson chose to speak about Aaron's "product and process," they had a duty to disclose the then known or recklessly disregarded

negative material facts that Aaron's had lost access to critical data feeds used by the algorithm, which therefore had not functioned properly in February, March, and April 2015, and that the leases approved by the algorithm had a significantly higher probability of default. Indeed, Defendants acknowledged during Aaron's October 30, 2015 Earnings Conference Call with investors that Aaron's knew about this data loss in February 2015 and that during the ten-week data outage, the algorithm was unable to accurately assess the ability of customers to pay—the key feature of the Progressive algorithm. Rather than reduce or stop use of the Progressive algorithm until the missing data was restored, or disclose this defect to the market, Defendants tried to underwrite leases as usual and expanded the introduction of the Progressive algorithm. The omission of these material facts rendered the foregoing statements materially false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay. Aaron's added this precise disclosure to its public filings only after the end of the Class Period.

101. During the April 24, 2015 Earnings Conference Call, Defendant Robinson also stated the following:

> Progressive delivered another outstanding quarter. Our virtual lease-to-own segment continues to deliver solid

> profitability from an expanding base. ***Continued rapid growth at Progressive was underpinned by stable lease portfolio performance*** and profitability in this segment exceeded our expectations.

102. Aaron's and Robinson's statements that "rapid growth at Progressive was underpinned by stable lease portfolio performance and profitability" were materially false and misleading at the time they were made. Once Aaron's and Robinson chose to speak about "rapid growth at Progressive" that "was underpinned by stable lease portfolio performance and profitability," they had a duty to disclose the then known or recklessly disregarded material facts that Aaron's had lost access to critical data feeds on which the Progressive algorithm based its decisions, which resulted in leases with a significantly higher probability of default and which negatively impacted the stability of Progressive's "lease portfolio performance." Indeed, Defendants acknowledged during Aaron's October 30, 2015 Earnings Conference Call with investors that Aaron's knew about this data loss in February 2015 and that during the ten-week data outage, the algorithm was unable to accurately assess the ability of customers to pay—the key feature of the Progressive algorithm. Rather than reduce or stop use of the Progressive algorithm until the missing data was restored, or disclose this defect to the market, Defendants tried to underwrite leases as usual and expanded the introduction of the Progressive algorithm. The omission of these material facts rendered the foregoing statements

materially false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining a lease customer's ability to pay. Aaron's added this precise disclosure to its public filings only after the end of the Class Period.

103. Also during the April 24, 2015 Earnings Conference Call, Defendant Robinson touted Progressive's performance and technology:

> Progressive has been growing at an exceptional rate. Importantly, it's growing profitably. We'll ***continue to invest in people and infrastructure*** to support new and existing retail partners and in ***technology***, training, and merchant support to drive higher productivity per door.
>
> While we continue to evolve, our philosophy remains the same. . . . This philosophy, ***coupled with our unique set of assets, including*** people, ***technology***, manufacturing, distribution and stores, position us well for the future.

104. The statements that Progressive continues "to invest in . . . infrastructure . . . and in technology" and that Progressive has a "unique set of assets, including . . . technology" were materially false and misleading when made because once Defendants Robinson and Aaron's chose to speak about Aaron's "infrastructure" and "technology," which included the Progressive algorithm, as well as investments Aaron's had made in such technology, they had a duty to disclose the then known or recklessly disregarded material negative facts that

Aaron's had lost access to the critical data feeds on which the Progressive algorithm based its decisions and that the leases approved by the algorithm had a significantly higher probability of default. Indeed, Defendants acknowledged during Aaron's October 30, 2015 Earnings Conference Call with investors that Aaron's knew about this data loss in February 2015 and that during the ten-week data outage, the algorithm was unable to accurately assess the ability of customers to pay—the key feature of the Progressive algorithm. Rather than reduce or stop use of the Progressive algorithm until the missing data was restored, or disclose this defect to the market, Defendants tried to underwrite leases as usual and expanded the introduction of the Progressive algorithm. The omission of these material facts rendered the foregoing statements materially false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that Aaron's was dependent on non-redundant third party data feeds when determining a customer's ability to pay. In addition, the claims that Aaron's technology was "driv[ing] higher productivity per door" and "position[s] us well for the future" were materially false and misleading when made because the loss of access to the data feeds, and the Company's inability to detect delinquencies during the second and third quarters of 2015, added less "productive" leases to Aaron's pool and did not position Aaron's well for the future. In fact, the October 2015 disclosure of those

problems led analysts to question whether Aaron's had additional, greater problems with its systems and technology.

105. During the April 24, 2015 Earnings Conference Call, Defendant Robinson stressed the importance of Progressive "continu[ing] to . . . maintain our decisioning discipline," stating:

> At Progressive, we must continue to provide outstanding service for our existing retailers, build relationships with new retailers, ***maintain our decisioning discipline***, and continue to innovate our products and process.

106. These statements were materially false and misleading when made. By this time, Defendants knew or recklessly disregarded that Aaron's had previously lost access to critical data feeds on which the Progressive algorithm based its decisions. Yet, Aaron's and Robinson falsely and misleadingly claimed that the Company had kept a consistent level of "decisioning discipline" that it would "continue" to "maintain." Once Defendants Robinson and Aaron's chose to speak about the Company continuing to maintain its "decisioning discipline," they had a duty to disclose the then known or recklessly disregarded facts that Aaron's had lost access to the data used by the Progressive algorithm and that that loss had eroded its "decisioning discipline." Indeed, Defendants acknowledged during Aaron's October 30, 2015 Earnings Conference Call with investors that Aaron's knew about this data loss in February 2015 and that during the ten-week data outage, the

algorithm was unable to accurately assess the ability of customers to pay—the key feature of the Progressive algorithm. Rather than reduce or stop use of the Progressive algorithm until the missing data was restored, or disclose this defect to the market, Defendants tried to underwrite leases as usual and expanded the introduction of the Progressive algorithm. The omission of these material facts rendered the foregoing statements materially false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay. Aaron's added this precise disclosure to its public filings only after the end of the Class Period.

107. During the April 24, 2015 Earnings Conference Call, Defendant Woodley also reported an 85% increase in revenues year-over-year at Progressive, and stressed that "[i]mportantly, we are achieving strong rates of growth while ***maintaining consistent lease portfolio performance***."

108. These statements were materially false and misleading when made. By this time, Defendants knew or reckless disregarded that Aaron's had lost access to a critical data feed on which the Progressive algorithm based its decisions, resulting in leases with a significantly higher probability of default and negatively impacting the consistency of "lease portfolio performance." Once Defendants chose to speak

about "lease portfolio performance" they had a duty to disclose all contrary material facts, *i.e.*, the loss of access to critical data feeds and the leases' significantly higher probability of default. The omission of these material facts rendered the foregoing statements materially false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay. Aaron's added this precise disclosure to its public filings only after the end of the Class Period.

109. Also during the April 24, 2015 Earnings Conference Call, Defendant Michaels discussed improvements in write-offs and Aaron's e-commerce capabilities, which utilized the Progressive algorithm:

> ***Write-offs as a percentage of store revenues were 3%, which was flat versus the year-ago period. This compares favorably to the 30 basis point year-over-year increase we experienced last quarter.***
>
> We are also excited to launch some initiatives that have meaningful potential to drive revenues and profit. Among these is the promotion of our e-commerce capabilities. We are currently able to transact online in approximately 70% of Aaron's existing markets, and we are ahead of our original plans to be chain-wide by this fall. ***We continue to be encouraged by the fact that over 70% of our online transactions are with people who have never done business with Aaron's before.*** We are planning a June event that will highlight our online capabilities, and we expect this promotion will help drive awareness and

extend our customer reach even further.

110. These statements were materially false and misleading when made. Michaels's statements that Aaron's write-offs were 3% of store revenues and that this metric "compare[d] favorably to the 30 basis point year-over-year increase" were materially false and misleading because they failed to disclose that Progressive's leases approved in February, March and April 2015 were based on incomplete data and had a significantly higher probability of defaults and write-offs. Once Aaron's and Michaels spoke of write-offs and e-commerce capabilities, they had a duty to disclose that Aaron's write-offs would likely materially increase as a result of Aaron's loss of access to the critical data feeds. Defendants Aaron's and Michaels made these statements with the knowledge, or with reckless disregard of the fact, that Aaron's loss of data access resulted in a material increase in leases with a significantly higher probability of default, and consequential write-offs. The omission of these material facts rendered these statements materially false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay. Aaron's added this precise disclosure to its public filings only after the end of the Class Period.

111. During the April 24, 2015 Earnings Conference Call, Defendants also responded to analysts' questions concerning the impact of the Progressive acquisition on Aaron's customer base. For instance, an analyst from Sidoti & Co. asked Defendant Woodley whether, since being acquired by Aaron's, Progressive had "been able to be more aggressive with the customers that they are accepting," or if "you are taking on a different consumer than you have historically[.]" In response, Woodley stated:

> What we've found we win with retailers is when ***we can deliver the highest sustainable approval rate and highest sustainable conversion rate***. And we do that by ***constantly improving our underwriting algorithm***, which allows us to buy as deep as possible. We feel we are the market leader in that regard and we've invested a lot and are continuing to maintain that edge. And that goes to exactly I think what your question is, which is for us ***it's a function of several things, getting smarter on the front end with underwriting*** and getting more efficient on the back end with pickup and recovery. And certainly having the 17 hubs out in the field has enabled us to be more efficient than we have been historically, nonrecovering, nonperforming assets in the field.

112. The statements that the Company is "constantly improving our underwriting algorithm" and "getting smarter on the front end with underwriting" were materially false and misleading when made because, as Defendants later admitted, by February 2015 the Company had lost access to the critical data feeds on which the Progressive algorithm based its decisions. Once Defendants Woodley

and Aaron's chose to speak about the "underwriting algorithm" and how Aaron's was "smarter on the front end with underwriting," they had a duty to disclose the then known or recklessly disregarded material negative facts that Aaron's had previously lost access to the critical data feeds to the Progressive algorithm and that the leases approved by the algorithm had significantly higher probability of default. The omission of these material facts rendered the foregoing statements materially false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining a customer's ability to pay. In addition, Aaron's and Woodley's statements that Aaron's was able to "deliver the highest sustainable approval rate and highest sustainable conversion rate" by "constantly improving our underwriting algorithm" were materially false and misleading because Aaron's was able to approve and convert so many customers by willfully ignoring (and failing to disclose to investors) that the Progressive algorithm it used to approve and convert customers had in fact lost access to critical data feeds, and that the leases approved by the algorithm had a significantly higher probability of default.

113. During the April 24, 2015 Earnings Conference Call, the Sidoti & Co. analyst also asked whether approval rates were increasing within Progressive and

whether there had been any changes in return patterns. Woodley responded that the Company had:

> … been ***able to deliver a slight increase in approval rates for retailers. And obviously, the onus is on the team to make sure that that volume is predictably profitable, which is what they've been able to execute extremely well on***.
>
> [W]e've seen a slightly favorable shift in the mix of these dispositions toward more full-term payers, which hopefully is a good trend. What we try and do is make sure that the function of all those variables . . . ***the shift in the mix of lease dispositions and pricing and everything, yields an improvement in curves year-over-year in the performance of our lease portfolio which, is exactly what we're seeing***.

114. These statements were materially false and misleading when made. Contrary to Aaron's and Woodley's statements that Aaron's was able to deliver "a slight increase in approval rates for retailers," and that the Aaron's "team" had executed "extremely well" on ensuring that the increased volume was "extremely profitable," the increased volume in approved customers was not extremely profitable. In fact, Aaron's increased approval rates were based on decisions by the Progressive algorithm at a time when it lacked access to critical data feeds on which the algorithm based its decisions, and the leases approved by the algorithm had a significantly higher probability of default. In addition, contrary to Woodley's statements that the Company aims to "yield[] an improvement in curves year-over-

year in the performance of our lease portfolio ***which is exactly what we're seeing***," Defendants knew or recklessly disregarded that Aaron's had lost access to critical data feeds in February, March, and April 2015 that were critical to determine the ability of customers to pay, which resulted in a material increase in leases with a significantly higher probability of default and thereby negatively impacted the "performance" of the "lease portfolio." Once Defendants Aaron's and Woodley spoke about an increase in the performance of Aaron's lease portfolio, they had a duty to disclose adverse facts whose non-disclosure rendered these statements misleading. The omission of these material facts rendered these statements materially false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay. Aaron's added this precise disclosure to its public filings only after the end of the Class Period.

115. Also during the April 24, 2015 Earnings Conference Call, an analyst from Stephens Inc. asked Defendants about approval rates and the impact of Progressive on those rates. In response, Defendant Michaels stated that:

> … ***we are leveraging the Progressive technology certainly, which was a huge, huge win from the acquisition.*** We are always looking for a way to say yes at Aaron's and so we are figuring out ways to talk to

> customers through chat and on the phone. It's not a frictionless transaction. We're not really getting into approval rates, but we are seeing a very – ***we are seeing a good customer that to date is actually performing very well and slightly better than what we see in our stores. And so we have the ability to continue to tweak and adjust that decisioning tool just like Progressive does in their merchants. But we are pleased with the results and the performance of those customers to date.***

116. These statements were materially false and misleading when made. ***First***, Aaron's and Michaels's claims that Aaron's was presently "successfully leveraging the Progressive technology[,]" and that Aaron's presently had "the ability to continue to tweak and adjust [the] decisioning tool[,]" were materially false and misleading when made because in February, March and April 2015, Aaron's had not successfully leveraged the Progressive algorithm because Aaron's lost access to critical data that fed the algorithm, and its ability to successfully "tweak" and "adjust" the algorithm was impaired. ***Second***, the foregoing statements were materially false and misleading when made because once Defendants Aaron's and Michaels chose to speak about Progressive's "technology" and "decisioning tool," they had a duty to disclose the then known or recklessly disregard negative material facts that Aaron's had lost access to critical data feeds on which the Progressive algorithm based its decisions and that the leases approved by the algorithm had a significantly higher probability of default. Indeed, Defendants acknowledged during

Aaron's October 30, 2015 Earnings Conference Call with investors that Aaron's knew about this data loss in February 2015 and that during the ten-week data outage, the algorithm was unable to accurately assess the ability of customers to pay—the key feature of the Progressive algorithm. Rather than reduce or stop use of the Progressive algorithm until the missing data was restored, or disclose this defect to the market, Defendants tried to underwrite leases as usual and expanded the introduction of the Progressive algorithm. The omission of these materials facts rendered these statements materially false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay. Aaron's added this precise disclosure to its public filings only after the end of the Class Period. ***Third***, Michaels's statements that the Company was "seeing a good customer that to date is actually performing very well" and that Defendants were "pleased with the results and the performance of those customers to date" were materially false and misleading when made because as Defendants later admitted, by this time Aaron's had lost access to critical data feeds enabling them to determine the ability of customers to pay, and this resulted in a material increase in leases with a significantly higher probability of default.

117. In response to Defendants' statements, the price of Aaron's stock

increased by $3.43 per share, or 10.5%, to close at $32.80 on April 24, 2015.

118. Analysts also responded favorably to the Company's April 2015 statements. For instance, in a report published on April 24, 2015, analysts at KeyBanc Capital Markets wrote that "charge-offs were 6.4% vs. 6.5% last year. Over the longer term, Progressive write-offs should benefit from leveraging Aaron's collections infrastructure (which is core to the business)." On April 27, 2015, analysts at BB&T Capital Markets also seized on the decline in reported write-offs, stating "Previously we had written that loss rates in Progressive (which increased 80 bps in Q4'14 yr/yr) were worth monitoring, so this modest improvement is encouraging."

**D. May 2015**

119. On May 7, 2015, Aaron's filed with the SEC its Form 10-Q, signed by Defendant Danielson, for the quarterly period ended March 31, 2015 (the "May 7, 2015 Form 10-Q"). The May 7, 2015 Form 10-Q incorporated the same materially false and misleading earnings projections announced in the April 24, 2015 Press Release, stated above in ¶97. The May 7, 2015 Form 10-Q also reported bad debt expense of $29.9 million, bad debt allowance of $29.3 million, and write-offs of $29.3 million for the three months ended March 31, 2015.

120. These reported financial metrics were materially false and misleading

because they underreported the true state of Aaron's bad debt expense, bad debt allowance, and write-offs. Having chosen to speak regarding Aaron's bad debt expense, bad debt allowance and write-offs, Defendants Aaron's and Danielson had a duty to disclose all material facts necessary to render those statements not misleading. As Defendants admitted during an October 30, 2015 Earnings Conference Call, beginning in February 2015 Aaron's lost access to critical data feeds on which the Progressive algorithm based its decisions, the leases approved by the algorithm had a significantly higher probability of default, and, as a result of software errors in Progressive's lease management system, Aaron's was unable to timely identify and begin collection activities on certain delinquent leases during the second and third quarters of 2015. The omission of these material facts rendered the foregoing statements materially false and misleading. During the same October 30, 2015 conference call, Defendant Woodley reported that a third quarter increase of $4 million in bad debt expense and lease merchandise write-offs resulted in an earnings miss. The failure to disclose the negative information materially impacting the Company's reported financial metrics also rendered those metrics materially false and misleading. The foregoing statements about the Company's reported financial metrics were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party

data feeds when determining customers' ability to pay. Aaron's added this precise disclosure to its public filings only after the end of the Class Period.

121. Also in the May 7, 2015 Form 10-Q, Aaron's stated in its risk disclosures that "[t]he Company does not have any updates to its risk factors disclosure from that previously reported in the 2014 Annual Report."

122. These statements were materially false and misleading when made. As discussed above in ¶¶90-94, Aaron's 2014 Form 10-K included risk factors stating, among other things, that "Progressive's proprietary algorithm used to approve customers ***could*** no longer be indicative of our customer's ability to pay"; that "[i]f our information technology systems are impaired, our business could be interrupted, our reputation could be harmed and we may experience lost revenues and increased costs and expenses"; that "[f]ailures of our systems, such as 'bugs,' crashes, operator error or catastrophic events, could seriously impair our ability to operate our business" and "[i]f our information technology systems are impaired, our business (and that of our franchisees) could be interrupted, our reputation could be harmed, we may experience lost revenues or sales and we could experience costs and expenses to remediate the problem." At the time the May 7, 2015 Form 10-Q was filed, Defendants knew or recklessly disregarded that the foregoing material risks warned of in the 2014 Form 10-K had, in fact, already occurred. Defendants were

already aware or recklessly disregarded that they had lost access to critical data feeds enabling them to use the Progressive algorithm to properly assess its customers' ability to pay, that the leases approved by the algorithm had a significantly higher probability of default, and that "software errors" in Progressive's lease management system during the second and third quarters of 2015 caused certain delinquent accounts to go undetected, thus preventing Aaron's from timely identifying such accounts and beginning prompt collections activities. Defendants' omission of these material facts rendered the foregoing statements materially false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay. Aaron's added this precise disclosure to its public filings only after the end of the Class Period.

123. The Defendants' foregoing statements in the May 7, 2015 Form 10-Q were further materially false and misleading because, in misrepresenting the capabilities and functional status of the Progressive algorithm, Defendants concealed that the leases that were approved during the ten-week data outage of critical data feeds had a significantly higher probability of default. Moreover, by omitting mention of the lease management "software errors" that occurred during the second and third quarters of 2015, Defendants concealed that Aaron's ability to begin

prompt collections activities had been materially impacted. As such, Defendants failed to disclose (1) material events and known uncertainties that were reasonably likely to have a material adverse effect on Aaron's results and operations in violation of the disclosure requirements set forth in Item 303; and (2) significant, then-existing (as opposed to potential) factors that made Aaron's securities more speculative or risky than the Company disclosed in violation of the disclosure requirements set forth in Item 503.

**E. July 2015**

124. On July 24, 2015, Aaron's issued a press release in which it announced its second quarter 2015 financial results (the "July 24, 2015 Press Release"). On the same day, Aaron's filed with the SEC a Form 8-K that was signed by Defendant Danielson and attached the July 24, 2015 Press Release as an exhibit (the "July 24, 2015 Form 8-K"). The July 24, 2015 Press Release and the July 24, 2015 Form 8-K increased full year 2015 EBITDA guidance as follows:

> **Progressive**
>
> EBITDA in the range of $120 million to $130 million compared with the previous guidance of $105 million to $115 million.
>
> **Consolidated Results**
>
> EBITDA in the range of $325 million to $350 million compared with the previous guidance of $305 million to $335 million.

Also, on July 24, 2015, Aaron's held a conference call with investors to discuss its second quarter 2015 earnings (the "July 24, 2015 Earnings Conference Call"). During the July 24, 2015 Earnings Conference Call, Defendant Robinson stated that the Company was "raising its EBITDA and EPS outlook for 2015 ***to reflect*** the success of its profitability initiatives in the core business and ***stronger trends in Progressive.***"

125. These statements were materially false and misleading when made. ***First***, these projections lacked a reasonable basis because, rather than there being unqualified "stronger trends in Progressive," the leases approved during Aaron's data feed outage were based on incomplete information and had a significantly higher probability of default, bad debt expense, and write-offs. ***Second***, once Defendants chose to speak about the "trends" at Progressive and projected earnings, they had a duty to disclose adverse facts whose non-disclosure rendered these statements misleading. But, these statements failed to disclose that earnings would in fact be negatively impacted by increases in write-offs and bad debt expense because "software errors" in Progressive's lease management system during the second and third quarters of 2015 caused certain delinquent accounts to go undetected, thus preventing Aaron's from timely identifying such accounts and beginning prompt collections activities. Defendants set forth these expectations with

the knowledge, or reckless disregard of the fact, that their loss of data access resulted in a material increase in leases with a significantly higher probability of default, and consequential charge-offs. Indeed, on October 30, 2015, Defendants announced that they were forced to reduce earnings guidance because of increased write-offs and bad debt expense, reducing Progressive's EBITDA guidance to a range of $103 million to $108 million, and reducing Aaron's consolidated EBITDA guidance to a range of $308 million to $328 million. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay. Aaron's added this precise disclosure to its public filings only after the end of the Class Period.

126. In the July 24, 2015 Press Release, the Company also reported Progressive's write-offs for "damaged, lost or unsaleable merchandise" as 6.1% of revenues.

127. This metric was materially false and misleading because it failed to disclose that Progressive's leases in February, March and April 2015 were based on incomplete data and had a significantly higher probability of defaults and write-offs. Once Aaron's chose to speak about the Company's write-offs, it had a duty to disclose adverse facts whose non-disclosure rendered these statements misleading.

But these statements failed to disclose that Aaron's write-offs would likely materially increase as a result of Aaron's loss of access to the critical data feeds. Aaron's made these statements with the knowledge, or reckless disregard of the fact, that Aaron's loss of access to critical data feeds resulted in a material increase in leases with a significantly higher probability of default, and consequential charge-offs. The failure to disclose this negative information rendered these statements materially false and misleading. Also by this time, Defendants knew or recklessly disregarded the "software errors" that affected Progressive's lease management system during the second and third quarters of 2015, which caused delinquent accounts to go undetected and prevented Aaron's from beginning prompt collections activities; as a result, the write-offs did not accurately reflect the Company's delinquent accounts. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay. Aaron's added this precise disclosure to its public filings only after the end of the Class Period.

128. In the July 24, 2015 Press Release, the Company also attributed the purported "strength of Progressive's EBITDA margin in the second quarter" to "***strong lease portfolio performance***, improved collection metrics, and increasing

leverage on fixed operating expenses."

129. These statements were materially false and misleading when made. Once Aaron's chose to speak about the "strength" of Progressive's EBITDA margin, its "strong lease portfolio performance," and its "improved collection metrics," it had a duty to disclose adverse facts whose non-disclosure rendered these statements materially misleading. By this time, Defendants knew or recklessly disregarded that, in February, March and April 2015, Aaron's had lost access to critical data feeds used by the Progressive algorithm to determine the ability of customers to pay, resulting in leases with a high likelihood of default and negatively impacting the strength of "lease portfolio performance." Also by this time, Defendants knew or recklessly disregarded the "software errors" that affected Progressive's lease management system during the second and third quarters of 2015, which caused delinquent accounts to go undetected and prevented Aaron's from beginning prompt collections activities; as a result, the "improved collection metrics" did not accurately reflect the Company's ability to collect on delinquent accounts. The omission of these material facts rendered the foregoing statements materially false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay.

Aaron's added this precise disclosure to its public filings only after the end of the Class Period.

130. During the July 24, 2015 Earnings Conference Call, Defendant Robinson also stated that, "Progressive achieved solid top-line growth, with a higher profit margin."

131. These statements were materially false and misleading when made. Once Defendants Aaron's and Robinson chose to discuss Progressive's margins, they had a duty to disclose material facts whose non-disclosure rendered those statements materially misleading. This included the fact that Aaron's loss of access to the critical data feeds used by the Progressive algorithm in February, March and April 2015 was having a material negative impact on Aaron's bad debt expense and merchandise write-offs (with a concomitant negative impact on the Company's margins). The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay. Aaron's added this precise disclosure to its public filings only after the end of the Class Period.

132. Also during the July 24, 2015 Earnings Conference Call, Defendant Robinson stated:

> ***Progressive continues to exceed our expectations***. Revenues and margins improved significantly. Our product is clearly resonating, as evidenced by a significant increase in invoice dollars per active door and our robust pipeline for new retail partners. While we believe ***we have the industry-leading, virtual lease-to-own solution in the market, we continue to invest in*** people and ***technology*** to drive more innovation so that we can serve more customers and drive more revenues for our retail partners.

133. These statements were materially false and misleading when made. Once Defendants Aaron's and Robinson chose to speak about Aaron's "technology" and "industry-leading, virtual lease-to-own solution in the market," they had a duty to disclose the material negative fact that Aaron's had lost access to critical data feeds on which the Progressive algorithm based its decisions and that the leases approved by the algorithm had a significantly higher probability of default. Indeed, Defendants acknowledged during Aaron's October 30, 2015 Earnings Conference Call with investors that Aaron's knew about this data loss in February 2015 and that during the ten-week data outage, the algorithm was unable to accurately assess the ability of customers to pay—the key feature of the Progressive algorithm. Rather than reduce or stop use of the Progressive algorithm until the missing data was restored, or disclose this defect to the market, Defendants tried to underwrite leases as usual and expanded the introduction of the Progressive algorithm. The omission of these material facts rendered the foregoing statements materially false and

misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay. Aaron's added this precise disclosure to its public filings only after the end of the Class Period.

134. Also during the July 24, 2015 Earnings Conference Call, Defendant Woodley stated that "we're . . . maintaining consistent lease portfolio performance."

135. These statements were materially false and misleading when made. By this time, Defendants knew or recklessly disregarded that they had lost access to critical data feeds necessary for consistent "lease portfolio performance," resulting in leases with a high likelihood of default and impacting the consistency of "lease portfolio performance." Once Defendants chose to speak about "lease portfolio performance," they had a duty to disclose adverse facts whose non-disclosure rendered these statements false and misleading. Indeed, Defendants acknowledged during Aaron's October 30, 2015 Earnings Conference Call with investors that Aaron's knew about this data loss in February 2015 and that during the ten-week data outage, the algorithm was unable to accurately assess the ability of customers to pay—the key feature of the Progressive algorithm. Rather than reduce or stop use of the Progressive algorithm until the missing data was restored, or disclose this

defect to the market, Defendants tried to underwrite leases as usual and expanded the introduction of the Progressive algorithm. The omission of these material facts rendered the foregoing statements materially false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay. Aaron's added this precise disclosure to its public filings only after the end of the Class Period.

136. Also during the July 24, 2015 Earnings Conference Call, Defendants responded to analyst questions concerning the Progressive acquisition. Specifically, Robinson was asked whether the Progressive acquisition was "progressing as expected[.]" Robinson responded:

> ***I'd say a couple of different areas, the first being eCommerce. That was certainly a big initiative for us, right after the merger, to get that up and running, using the Progressive front-end technology to get the transaction approved and executed.***
>
> ***And that's gone extremely well. We're ahead of plan, as far as I'm concerned, in terms of where we are with access to customers across all our states. The process is working really well.***
>
> We're doing really meaningful volumes, as Steve talked about. We do believe this will be a significant part of our business.
>
> If you look at it just in June, it's a significant piece of what

> our future is going to be, for sure. So from that perspective, I would say that's a very positive result of the merger already. And it's not only benefiting the Company, but also our franchisees, which is very exciting for us.

137. These statements were materially false and misleading when made. Once Defendants Aaron's and Robinson touted the benefits from the Progressive merger with respect to "eCommerce" and "the Progressive front-end technology to get the transaction approved and executed" (*e.g.*, the Progressive algorithm), including Aaron's "doing really meaningful volumes," and described the process as "working really well," they had a duty to disclose the loss of access to the data feeds critical to the Progressive algorithm and "front-end technology," and that the leases approved by the algorithm had a significantly higher probability of default. The omission of those material facts rendered the foregoing statements materially false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay. Aaron's added this precise disclosure to its public filings only after the end of the Class Period.

138. During the July 24, 2015 Earnings Conference Call, Defendant Woodley was asked to explain what was driving the growth in invoice volume at Progressive. He responded:

> [W]hat we want to see is a consistently strong growth rate in the invoice volume, period-over-period. Which is, fortunately, what we saw in Q2, and what we have seen in the past. Because that means we're ***doing a better job at the point of sale***, improving the experience for both the retailer and the customer.

139. Woodley's statements that Aaron's had experienced a strong growth rate in invoice volume because the Company was "doing a better job at the point of sale" were materially false and misleading because before the second quarter, Aaron's had lost access to the critical data feeds used in the Progressive algorithm "at the point of sale" that was still having a negative impact on the Company's financial performance. Once Defendants chose to speak about the Company's performance at the point of sale, they had a duty to disclose adverse facts whose non-disclosure rendered these statements false and misleading, i.e., that Aaron's had lost access to critical data feeds on which the Progressive algorithm based its decisions and that the leases approved by the algorithm had a significantly higher probability of default. Indeed, Defendants acknowledged during Aaron's October 30, 2015 Earnings Conference Call with investors that Aaron's knew about this data loss in February 2015 and that during the ten-week data outage, the algorithm was unable to accurately assess the ability of customers to pay—the key feature of the algorithm and a material reason that Aaron's acquired Progressive to embark on its omni-channel strategy. Rather than reduce or stop use of the Progressive algorithm until

the missing data was restored, or disclose this defect to the market, Defendants tried to underwrite leases as usual and expanded the introduction of the Progressive algorithm. The omission of these material facts rendered the foregoing statements materially false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay. Aaron's added this precise disclosure to its public filings only after the end of the Class Period.

140. During the July 24, 2015 Earnings Conference Call, Defendant Woodley was also asked "whether or not the ability to repossess" was helping Progressive achieve "strong collections." He responded:

> So first on the collections question, we did see a benefit from the hubs … in the second quarter, to a greater degree than the benefit that we saw in the first quarter. Those trends have continued. We love the trend line, and we expect it to continue. I think that's primarily what we're referring to in the way of collection metrics, because that's helping ***derive sequential and year-over-year improvement in a write-off metric, even in the face of such strong growth.***

141. These statements were materially false and misleading when made because they portrayed a state of affairs at the Company that was at odds with reality. Once Defendants Aaron's and Woodley chose to discuss positive "trends" on

collections in the first and second quarters, that they "love[d]" that trend line, and that it was driving improvement in the Company's "write-off metric," they had a duty to disclose that the "write-off metric" was significantly understated because of Aaron's undisclosed loss of access to critical data feeds during February, March and April 2015, that the leases approved by the algorithm had a significantly higher probability of default, and that Aaron's undisclosed software error failed to detect delinquent accounts and initiate prompt collections activities. Defendants made the foregoing statements with the knowledge, or reckless disregard of the fact, that Aaron's loss of data access resulted in a material increase in leases with a high likelihood of default and resulting charge-offs, and the Progressive lease management software error further increased the Company's bad debt exposure. The omission of these material facts rendered the foregoing statements materially false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay. Aaron's added this precise disclosure to its public filings only after the end of the Class Period.

142. During the July 24, 2015 Earnings Conference Call, Defendant Michaels was also asked about the "keep rate" (*i.e.*, whether merchandise was being

returned or repossessed before the end of a lease) on leases approved using the eCommerce tool. He answered:

> ***[W]hat we're seeing is a better renewal or collection performance, and the keep rate is not materially different than the in-store. We'll continue to monitor that, but right now it's early in the game, but positive.***

143. These statements were materially false and misleading when made because they portrayed a state of affairs at the Company that was at odds with reality. Once Defendants Aaron's and Woodley chose to discuss that they were observing "better renewal or collection performance," they had a duty to disclose that "renewal" and "collection performance" would be negatively impacted as a result of Aaron's loss of access to critical data feeds during February, March and April 2015, that the leases approved by the algorithm had a significantly higher probability of default, and that an undisclosed software problem failed to detect delinquent accounts and initiate prompt collections activities. Defendants made the foregoing statements with the knowledge, or reckless disregard of the fact, that Aaron's loss of data access resulted in a material increase in leases with a high likelihood of default and resulting charge-offs, and the Progressive lease management software error further increased the Company's bad debt exposure. The omission of these material facts rendered the foregoing statements materially false and misleading. The foregoing statements were also materially false and misleading for their failure to

disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay. Aaron's added this precise disclosure to its public filings only after the end of the Class Period.

144. In response to the Defendant's July 2015 false statements, analysts reported that they were especially pleased with Progressive's performance. On July 24, 2015, SunTrust Robinson Humphrey reported that "the fast-growing Progressive division is driving virtually all of the YoY growth." The same day, BB&T Capital Markets reported that "***Progressive continu[es] to hit on all cylinders***." and Cantor Fitzgerald stated, "Progressive continues to shine, with sales increasing 84% y/y in the quarter, and better-than-expected expense control fueled the bulk of the EPS upside versus our estimate." Later, on July 26, 2015, KeyBanc Capital Markets reported that "Progressive continues to exceed expectations and remains the primary driver of growth for the Company." The following day, Stephens, Inc. reported that "we continue to like [Aaron's] as we believe the core will stabilize and Progressive will drive impressive earnings growth as we move throughout the remainder of FY15 and into FY16."

**F. August 2015**

145. On August 6, 2015, Aaron's filed with the SEC its Form 10-Q for the quarter ended June 30, 2015 (the "August 6, 2015 Form 10-Q"), signed by Defendant

Danielson. The August 6, 2015 Form 10-Q incorporated the materially misstated earnings results set forth above in ¶124. The August 6, 2015 Form 10-Q also stated that:

> ***On a monthly basis, all damaged, lost or unsalable merchandise identified is written off.*** The Company records lease merchandise adjustments on the allowance method, which estimates the merchandise losses incurred but not yet identified by management as of the end of the accounting period based on historical write-off experience. ***As of June 30, 2015*** and December 31, 2014, ***the allowance for lease merchandise write-offs was $29.6 million*** and $27.6 million, respectively.
>
> ***Lease merchandise write-offs totaled $30.2 million*** and $21.0 million ***for the three months ended June 30, 2015*** and 2014, respectively, ***and $59.5 million*** and $34.7 million ***for the six months ended June 30, 2015*** and 2014, respectively.

146. These statements (including the reported write-off metrics) were materially false and misleading when made because they failed to account for unidentified defaulted leases as a result of Aaron's undisclosed software problems, and failed to disclose that write-offs were materially increased as a result of that software issue and Aaron's loss of access to critical data feeds in February, March and April 2015 used for Progressive's underwriting algorithm. Defendants made the foregoing statements with the knowledge, or reckless disregard of the fact, that Aaron's loss of data access impacted the write-off metrics. The omission of these

material facts renders the foregoing statements materially false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay. Aaron's added this precise disclosure to its public filings only after the end of the Class Period.

147. The August 6, 2015 Form 10-Q also reported bad debt expense of $67.8 million for the six months ended June 30, 2015, and bad debt allowance of $29.9 million as of June 30, 2015.

148. These metrics were materially misstated. As Defendants admitted during an October 30, 2015 Earnings Conference Call, beginning in February 2015, Aaron's lost access to critical data feeds necessary for the Progressive algorithm, and, as a result of a software error in Progressive's lease management system, failed to timely identify and begin collections activities on certain delinquent accounts during the second and third quarters of 2015. During the October 30, 2015 conference call, Defendant Robinson reported that a third quarter increase of $4 million in bad debt expense and lease merchandise write-offs resulted in an earnings miss. Had these write-offs been recorded as they were occurring, or had Defendants been able to begin prompt collections on delinquent accounts, the bad debt metrics reported on August 6, 2015 would have been higher and were thus understated. The

failure to disclose the underlying causes of these materially negative impacts on these metrics rendered the metrics materially false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay. Aaron's added this precise disclosure to its public filings only after the end of the Class Period.

149. The August 6, 2015 Form 10-Q also did not contain any change or update to the Company's risk disclosures related to the Progressive algorithm or the Company's information technology systems that were previously reported in the 2014 Form 10-K, discussed above in ¶¶90-94.

150. As discussed above in ¶¶90-94, Aaron's 2014 Form 10-K included risk factors providing, among other things, that "Progressive's proprietary algorithm used to approve customers ***could*** no longer be indicative of our customer's ability to pay"; that "[i]f our information technology systems are impaired, our business could be interrupted, our reputation could be harmed and we may experience lost revenues and increased costs and expenses"; that "[f]ailures of our systems, such as 'bugs,' crashes, operator error or catastrophic events, could seriously impair our ability to operate our business" and "[i]f our information technology systems are impaired, our business (and that of our franchisees) could be interrupted, our reputation could

be harmed, we may experience lost revenues or sales and we could experience increased costs and expenses to remediate the problem." At the time the August 6, 2015 Form 10-Q was filed, Defendants knew or recklessly disregarded that the foregoing material risks warned of in the 2014 Form 10-K had, in fact, already occurred. Defendants were already aware or recklessly disregarded that they had lost access to critical data feeds enabling them to use the Progressive algorithm to properly assess its customers' ability to pay, that the leases approved by the algorithm had a significantly higher probability of default, and that the "software errors" that occurred during the second and third quarters of 2015 failed to identify a number of accounts as being delinquent and negatively affected Aaron's ability to begin prompt collections activities. The omission of these material facts rendered the foregoing statements materially false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay. Aaron's added this precise disclosure to its public filings only after the end of the Class Period.

151. The Defendants' foregoing statements in the August 6, 2015 Form 10-Q were further materially false and misleading because, in misrepresenting the capabilities and functional status of the Progressive algorithm, Defendants concealed

that the leases that were underwritten during the ten-week data outage had a significantly higher probability of default. Moreover, by omitting mention of the "software errors" that occurred during the second and third quarters of 2015, Defendants concealed that Aaron's ability to begin prompt collections activities had been materially impacted. As such, Defendants failed to disclose (1) material events and known uncertainties that were reasonably likely to have a material adverse effect on its results and operations in violation of the disclosure requirements set forth in Item 303; and (2) significant, then-existing (as opposed to potential) factors that made the securities more speculative or risky than the Company disclosed in violation of the disclosure requirements set forth in Item 503.

## G. September 2015

152. On September 22, 2015, Aaron's issued a press release in which it announced the acquisition of The HELPcard®[7] and the launch of Approve.Me[8] (the "September 22, 2015 Press Release"). In the September 22, 2015 Press Release, the

---

[7] During a September 22, 2015 conference call, Defendants Robinson and Woodley explained that the HELPcard "operates as a second look provider" and "offers a variety of second look financing programs to help a broad base of retailers in product segments that complement Progressive's existing business." Specifically, it "offers non-prime customers a variety of open-end financing programs originated through a partner bank" and "enables Progressive to augment its offering to better serve the retail financing needs of non-prime customers."

[8] During the same September 22, 2015 conference call, Defendants Robinson and Woodley explained that Approve.Me is a "proprietary platform" that "provides a single application for all customers seeking credit approval and lease options."

Company stated:

> The HELPcard® subsidiary is expected to enable Progressive to drive incremental revenue and earnings growth. It offers retail partners, along with Progressive's existing product and the new Approve.Me platform, one source for financing and leasing transactions for below prime consumers. The HELPcard® will in turn benefit from Progressive's ***proprietary technology***, infrastructure, and financial capacity.

153. These statements were materially false and misleading when made because once Defendants Aaron's and Danielson chose to speak about "Progressive's proprietary technology," Defendants had a duty to disclose the loss of access to critical data feeds on which underwriting decisions were based. Indeed, as Defendants admitted during an October 30, 2015 Earnings Conference Call with investors, the Company had already begun to understand the negative financial impact of the loss of data access "in August" 2015. The failure to disclose this material information—including the fact that Aaron's understood that the loss of data access and the Progressive lease management software issue were having an impact on the Company's financial statements—rendered the foregoing statements materially false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay. Aaron's added this precise disclosure to its public filings only after

the end of the Class Period.

154. On the same day, Aaron's held a conference call to discuss The HELPcard® acquisition and the Approve.Me launch (the "September 22, 2015 Conference Call"). During the September 22, 2015 Conference Call, Defendant Robinson described the The HELPcard® acquisition and the Approve.Me launch as "two important strategic steps to continue the ***strong and profitable growth of our Progressive business***."

155. In response to these statements, analysts recognized that the HELPcard® acquisition was particularly beneficial because of the opportunity to leverage Progressive's technology. For example, on September 23, 2015, Northcoast Research reported:

> Together, The HELPcard and Progressive, including its Approve.Me platform will allow Aaron's to offer retailers searching for "second look" and "third look" solutions a one-stop shopping solution, which is something that the other leaders in the virtual rent-to-own world cannot do. We are reiterating our BUY rating. . . . The HELPcard is an excellent strategic fit with Progressive's existing capabilities. As such, we anticipate tangible revenue synergies and margin benefits will be harvested from cross-selling the enhanced portfolio of financing solutions and efficiency gains, including ***the benefits of leveraging the respective technologies***.

156. The statements in the September 22, 2015 Press Release and September 22, 2015 Conference Call regarding Progressive were materially false and

misleading when made because once Defendants Aaron's and Robinson chose to speak about "the strong and profitable growth of our Progressive business," Defendants had a duty to disclose the loss of access to critical data feeds, as well as the lease management software error at Progressive, both of which negatively impacted the "strong and profitable growth" of the Progressive business. Indeed, as Defendants admitted during an October 30, 2015 Earnings Conference Call with investors, the Company had already begun to understand the negative financial impact of the loss of data access and the software issue "in August" 2015. The failure to disclose this material information—including the fact that Aaron's understood that the loss of data access and the software issue were having an impact on the Company's financial statements—rendered the foregoing statements materially false and misleading. The foregoing statements were also materially false and misleading for their failure to disclose that the Progressive algorithm was dependent on non-redundant third party data feeds when determining customers' ability to pay. Aaron's added this precise disclosure to its public filings only after the end of the Class Period.

## VI. THE TRUTH EMERGES

157. The truth regarding Aaron's loss of access to critical data feeds to its underwriting algorithm, a subsequent failure by Aaron's software to detect

delinquent customers, the material negative effect of these undisclosed problems on Aaron's merchandise write-offs and bad debt expense, and the fact that Defendants had been concealing these issues and the Company's reliance on non-redundant third party data feeds for nearly nine months, emerged on October 30, 2015 in an Aaron's press release (the "October 30, 2015 Press Release"), and later that day during Aaron's Earnings Conference Call with investors.

158. In the October 30, 2015 Press Release, Defendants Aaron's and Robinson disclosed that:

> Solid revenue growth at Progressive and continued expense control at our core stores was partially offset by lower than expected EBITDA at Progressive and negative same store revenues in the core segment . . . .
>
> Gross margin improved in the quarter, however, ***we experienced higher bad debt expense and merchandise write offs due to a temporary interruption of certain data attributes we use to approve leases, as well as software issues that delayed our ability to identify and begin collections on certain delinquent accounts.***

159. The October 30, 2015 Press Release expanded on Progressive's low reported margin, stating:

> The year-over-year change in margin was primarily due to an increase in bad debt expense and merchandise write offs that resulted from the following:
>
> - The impact of a ***temporary interruption of certain data attributes used to make our approval***

> ***decisions. We lost access to the attributes in February 2015 and replaced them in April 2015. Leases generated during the period of interruption, while expected to be profitable, are charging off at higher rates than originally anticipated.*** Progressive's decisioning algorithm is now operating with improved functionality and redundancy, and we expect to return to more normalized levels of bad debt expense and write offs; and
>
> - Software issues that occurred during a limited period of time spanning the second and third quarters of 2015. ***These issues failed to identify a number of accounts as being delinquent and affected our ability to begin prompt collections activities.*** As a result . . . an adjustment was recorded in the third quarter to increase bad debt expense and merchandise write offs by $3.2 million.

160. Defendant Robinson also further stated during Aaron's October 30, 2015 Earnings Conference Call later that day that in February 2015, Aaron's discovered that there had been an "interruption of certain third party data used in our decisioning algorithm," and that as a result, the Company experienced "an increase in bad debt expense and write-offs," forcing the Company to lower its earnings guidance. Specifically, in the October 30, 2015 Press Release, the Company projected that for Progressive, revenues would "be at the low end of the guidance range of $1.05 billion to $1.15 billion," and lowered Progressive's projected 2015 EBITDA range to $103 million to $108 million, from previous guidance of $120

million to $130 million. The Company also lowered its 2015 consolidated EBITDA guidance to $308 million to $328 million, from previous guidance of $325 million to $350 million.

161. According to Defendant Robinson, the "February, March and April 2015 lease pools"—those leases issued during the data outage—performed poorly because without access to the critical data feeds, the algorithm was unable to accurately assess the credit risk of customers. Specifically, Defendant Woodley estimated that the data loss impacted approval decisions on "approximately 8% to 9% of applications over a 10-week period," and that Defendants expected those leases to be "below the [profitability] levels we originally anticipated." Woodley also acknowledged the significance of the data loss, stating that the data was "obviously more valuable elements for us in the scheme of the universe of the hundreds of variables that we do use."

162. Defendant Robinson also revealed during the October 30, 2015 Earnings Conference Call that a new software code introduced into the Company's lease management system during the second and third quarters of 2015 "resulted in a number of accounts not being identified as being delinquent and affected our ability to being prompt collection activities." According to Defendant Woodley, these issues resulted in an additional $4 million increase to bad debt expense and write-

offs in the third quarter, $3.2 million of which related to the second quarter, specifically.

163. During the conference call, analysts reacted to this disclosure with shock, and sought clarification as to why Defendants did not first alert investors until nine months after they discovered these problems. For example, a Stephens, Inc. analyst asked, "[w]hat was the missing data? And what happened there? Maybe some more color around why it went away in February? And then when did you – the official date when you solved the problem." Woodley responded that a third party "vendor discontinued including certain data elements in the stream they provide us." Further, rather than providing investors with specific dates, Woodley responded only that "[t]he issue began in February and was resolved in April." The analyst also asked for "some comfort around how you feel about [the algorithm] on a go-forward basis and this new data that you're going to have running the model in the algorithms on a go-forward basis?"

164. An analyst from Canaccord Genuity also expressed similar shock and concern over the financial impact of the various software errors and Defendants' decision to conceal them. The analyst asked for more detail on the loans generated during the ten-week outage, and asked, "what was the data, because obviously it was very important data that went missing? . . . [w]hen did you find out it was not

available to you anymore and ***why did you choose not to disclose that?***" Defendant Woodley responded:

> We discovered the issues – of course, we knew we had lost the data and developed a plan to replace it in February and March and it was replaced in April. The impact to our financial statements was – we began to understand the impact to our financial statements in August when we discovered and began to remediate the software code issues.

165. After Defendant Woodley's incomplete response (which did not answer "why" Aaron's chose not to disclose the problems much earlier), the Canaccord Genuity analyst followed up: "How did you not make a decision to reduce the number of agreements [] approved? If the approval engine was lacking key data, why not cut back on approvals during that period until you got it sorted?" Woodley responded that the Company knowingly relied on a narrower set of indicators than it historically had (placing a reckless, blind reliance on them). In Woodley's words:

> The indicators we've historically used to measure early-pool performance ultimately were less predicted for these pools than they had historically been because of the loss of the data.

166. Apparently concerned about any future nondisclosure, the analyst then asked Defendants:

> Have you changed your thoughts on disclosing changes in your approval process to the investing public? We've heard from you many, many times since this became an

> issue, which you knew about February through April. Any changes in your thoughts on visibility that we might get into alterations that you make to the approvals process or to your algorithm?

Rather than agree that the Company would be more transparent moving forward, Woodley only stated in response that "we will try [to] execute better going forward on delivering the bad-debt expense and write-off levels that we expect for the business."

167. In response to the Company's disclosures on October 30, 2015, the price of Aaron's stock fell sharply from a close of $33.55 on October 29 to a close of $24.67 on October 30—a stunning one-day decline of $8.88, or 26.5%, on exceptionally high trading volume of more than 9 million shares. This was the second largest percentage drop in Aaron's stock price since Aaron's first went public in 1982.



168. Later on October 30, following the Company's disclosures during the earnings call, analysts reported on Defendants' shocking disclosures as well as the Company's surprising and disappointing financial results. For example, BB&T Capital Markets reported "Progressive profitability falls off a cliff," and that the "decline was primarily driven by increases in bad debt and merchandise write offs due to temporary software errors that negatively impacted lease approval decisions and delinquent account collections." BB&T further reported that:

> We were disappointed by Aaron's Q3'15 "miss and lower," and were ***particularly troubled*** by Progressive's technology issues. Simply put, we were ***very surprised*** Progressive could allow ***"mission critical" functions*** such as lease approvals and delinquent account collections to be ***at risk to third party provider data changes and faulty software code. We believe these errors call into question Progressive's long-term growth prospects, which we think are core to the Aaron's bull thesis.***

BB&T went on to describe Aaron's earnings miss as "stunning" in light of the Company's half-year results and projections (which failed to account for a material number of risky and delinquent leases).

169. These negative reports continued in the days following the Company's October 30 disclosure. For example, on November 2, 2015, SunTrust Robinson Humphrey issued a report, this time stating that because of management's decision to conceal the loss of data access, "[i]nvestors have to wonder about the security of

other important data feeds," and that:

> ***Credibility is now an issue.*** Despite some slowing topline trends this year, the news flow around Progressive has been positive since its acquisition some 18 months ago. Now, this division has a black eye, and ***management is taking some heat for untimely news dissemination.***

The analyst added that "the market won't be in any mood" to support "a consumer name with credibility [and] subprime . . . issues right now."

170. Northcoast Research also issued a report on November 2, 2015, stating that developments within Aaron's were "overshadowed by the risk management and operational missteps at Progressive," and that Progressive will thus have to work "to regain the trust of investors[.]"

171. Thereafter, in Aaron's third quarter 2015 Form 10-Q filed on November 9, 2015, the Company further stated that:

> [T]here was an increase in bad debt expense and lease merchandise write-offs during the third quarter that resulted primarily from the following at Progressive:
>
> - The impact of a temporary interruption of certain data attributes used to make our approval decisions. We lost access to the attributes in February 2015 and replaced them in April 2015. Leases generated during the period of interruption, while expected to be profitable, are charging off at higher rates than originally anticipated. Progressive's decisioning algorithm is now operating with improved functionality and redundancy, and we expect to return to more normalized levels of bad debt expense and write-offs; and

> - Software issues that occurred during a limited period of time spanning the second and third quarters of 2015. These issues failed to identify a number of accounts as being delinquent and affected our ability to begin prompt collections activities.

172. In its third quarter 2015 Form 10-Q, the Company also finally updated its risk factors to reflect what had been known within Aaron's during the Class Period—that the Progressive algorithm was dependent on non-redundant third party data feeds. Specifically, the new language stated that the Company is:

> heavily dependent on data provided by third party providers. . . . [O]ur Progressive business employs a proprietary decisioning algorithm when making lease approval decisions for its customers. This algorithm depends extensively upon continued access to and receipt of data from external sources, such as third party data vendors…. If we were to lose access to this external data or if our access or use were restricted or were to become less economical or desirable, our Progressive, Aarons.com and Dent-A-Med businesses would be negatively impacted, which would adversely affect our operating results and financial condition.

This is an example of the type of disclosure to investors that Defendants should have made (but failed to) during the Class Period, although it alone did not fully convey the actual problems faced by the Company.

## VII. ADDITIONAL ALLEGATIONS OF SCIENTER

173. Numerous additional facts support a strong inference that Defendants Aaron's, Robinson, Michaels, Woodley and Danielson made their materially false

and misleading statements to investors purposefully or with severe recklessness.

174. Defendants made highly unreasonable omissions and misrepresentations that presented an extreme departure from the standards of ordinary care, and that presented a danger of misleading investors, which was either known to Defendants Aaron's, Robinson, Michaels, Woodley and Danielson or was so obvious that they must have been aware of it.

175. On October 30, 2015, Defendant Woodley admitted that he and others at Aaron's had known about the loss of critical data for its decisioning algorithm in February 2015 and the impact on Aaron's financial statements by August 2015. During Aaron's third quarter 2015 earnings call, an analyst asked about the Company's data loss: "[W]hen did you find out it was not available to you anymore and why did you choose not to disclose that?" In response, Defendant Woodley admitted on the call (with Defendants Robinson, Michaels and Danielson also present):

> ***We discovered the issues – of course, we knew we had lost the data and developed a plan to replace it in February and March and it was replaced in April***. The impact to our financial statements was – ***we began to understand the impact to our financial statements in August*** when we discovered and began to remediate the software code issues.

176. The fact that Woodley admitted that Aaron's fixed the data loss

problem in April 2015 also supports a strong inference that Aaron's was aware of the data loss problem, and had incurred costs to remedy it, very early on in the Class Period.

177. The fact that Woodley and others at Aaron's purportedly "began to understand the impact to our financial statements in August [2015] when we discovered and began to remediate the software code issues" also supports a strong inference that Defendants were aware of the software code issues by August at the latest.

178. Defendants purposely did not timely inform the market of Aaron's loss of access to the data feeds for the Progressive algorithm or the "software code issues" that Aaron's was experiencing, in the knowing or reckless hope that these issues would somehow resolve themselves without Defendants ever having to disclose them. As one court has described this type of fraudulent motive:

> The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.[9]

The loss of data access, the fact that Progressive was reliant on non-redundant third

---

9 *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008).

party data systems, and the "software code issues" were each, and collectively, material facts that required prompt disclosure to investors.

179. Defendants were further motivated to conceal the known problems with Progressive's algorithm and Aaron's technology because the Defendants (which included Aaron's career executives and former senior Progressive executives) were loathe to acknowledge any material negative facts related to Progressive only nine months following Aaron's $700 million acquisition of Progressive for fear of the market questioning not only the propriety of Aaron's decision to acquire Progressive, but also Aaron's prospects for growth and success, which investors ultimately did question when the truth was revealed.

180. Defendants were further motivated to conceal the known problems with Progressive's algorithm and Aaron's technology because, at the same time they announced the acquisition of Progressive, Aaron's rejected Vintage Capital's highly-lucrative $30.50 per share offer for Aaron's business in favor of Aaron's $700 million acquisition of Progressive. Indeed, after Defendants disclosed the negative facts about Progressive to the market in October 2015, the price of Aaron's stock fell to $24.67 per share – ***19%*** less than Vintage's $30.50 buyout offer.

181. The increases in the Company's bad debt expense during the second and third quarters of 2015 were a red flag that further supports a strong inference of

scienter. Aaron's bad debt expense had initially dropped by 19% from the fourth quarter of 2014 to the first quarter of 2015, but then it abruptly increased by 26.5% in the second quarter of 2015 (and continued to increase in the third quarter of 2015). Bad debt expense as a percentage of revenues also increased by 2.4% in the second quarter of 2015. The increase in the Company's bad debt expense was a red flag to the Defendants that the loss of data in the first quarter was having a negative impact on Aaron's lease portfolio, which further put them on notice of the need to disclose the loss of data feeds to investors.

182. The fact that Aaron's and Progressive track their delinquencies, including in 60-day and 120-day buckets, further supports a strong inference that, well before the end of the Class Period in October 2015, Defendants were on notice of the fact that the transactions entered into in February, March and April 2015 contained significant amounts of delinquencies that would have a significant negative impact on Aaron's financial results.

183. The data to which Aaron's lost access was also admittedly material to the Company, and this supports a strong inference that the Defendants were aware of its loss. Defendant Woodley stated on the Company's October 30, 2015 Earnings Conference Call that the lost data attributes were "***obviously more valuable elements for us*** in the scheme of the universe of the hundreds of variables that we do use."

184. Further, the fact that Aaron's experienced a significant loss of data over a lengthy period of time—data that, by Defendants' own admission, affected at least 8-9% of Aaron's lease originations over a ten-week period—supports a strong inference of scienter.

185. The fact that, prior to and during the Progressive acquisition, Defendants touted Progressive, its algorithm and its data attributes as being crucial to the improvement of Aaron's business at an "inflection point" in the Company's business, when its brick-and-mortar business was struggling supports a strong inference of scienter, as the Progressive business would be integrated with and become critical to Aaron's "core" business. The fact that the Progressive algorithm was a material factor in Aaron's decision to acquire Progressive, that the Individual Defendants were personally involved in analyzing the acquisition, and that the Progressive algorithm played an increasing role in Aaron's business, rendered it a key part of Aaron's "core operation" and supports a strong inference that the Defendants paid very close attention to it during the Class Period.

186. The market's intense focus on the Progressive algorithm and data access also supports a strong inference of scienter. As set forth herein, given the importance of the algorithm not only to Progressive's business, but to the growth of Aaron's and Aaron's goal of expanding its online presence and capabilities, the

market focused closely on the algorithm and its benefits. The significance of the algorithm to both Progressive and to Aaron's was evidenced not only by analyst commentary surrounding Aaron's acquisition of Progressive, but further by analysts' reaction to Defendants' eventual disclosure of the critical data loss and software errors. For example, during the October 30, 2015 Earnings Conference Call, analysts pressed for details and information, a Stephens, Inc. analyst asking, "What was the missing data? And what happened there? Maybe some more color around why it went away in February? And then when did you – the official date when you solved the problem." An analyst from Canaccord Genuity similarly asked:

> What was the data, because obviously it was ***very important data*** that went missing?
>
> ***
>
> [W]hen did you find out it was not available to you anymore and why did you choose not to disclose that?
>
> ***
>
> How did you not make a decision to reduce the number of agreements [] approved? If the ***approval engine was lacking key data***, why not cut back on approvals during that period until you got it sorted?

In a report following the earnings call, a BB&T Capital Markets analyst expressed surprise over the fact that "Progressive could allow 'mission critical' functions such as lease approvals and delinquent account collections to be at risk to third party

provider data changes and faulty software code." Analysts further expressed incredulity that Aaron's did not tell the market sooner or cut back on lease approvals during the outage. For example, on November 2, 2015, SunTrust Robinson Humphrey reported that "[the Progressive] division has a black eye, and management is taking some heat for untimely news dissemination." On the same day, Northcoast Research reported that positive developments at Aaron's were "overshadowed by the risk management and operational missteps at Progressive," and that:

> Progressive clearly has to execute well in 4Q15 and 1H16 to regain the trust of investors, and convince the Street that the technology behind Progressive and the strong growth trends warrant a multiple closer to a pure fintech enterprise than that of a subprime lender.

187. Additional analysts reported that Defendants' decision to conceal these facts resulted in a loss of credibility. In a report published on October 30 following the earnings call, a BB&T Capital Markets analyst found "the [Progressive] division's software errors inexplicable in this day and age." On November 2, 2015, Stephens, Inc. called the "data interruption" "concerning," and SunTrust Robinson Humphrey reported that "the market won't be in any mood" to support "a consumer name with credibility [and] subprime . . . issues right now." The same SunTrust Robinson Humphrey report went on to state that following the issues with the

Progressive algorithm, "[i]nvestors have to wonder about the security of other important data feeds," and that "[c]redibility is now an issue."

188. The fact that the Individual Defendants made specific reference to the Progressive algorithm repeatedly during the Class Period on conference calls with analysts and investors also supports a strong inference that the Defendants acted knowingly or with severe recklessness. Indeed, their statements represented to the market that they were personally knowledgeable of, and familiar with, the algorithm, including how the Company monitored and adjusted the algorithm on a constant basis. As part of such monitoring and adjustment, any loss of the critically-important data feeds would have been, and was, obvious to them. For example:

(a) Defendant Woodley stated on February 6, 2015: "What differentiates our model is our centrally-automated decision algorithms that allow underwriting changes to be made in real-time. Consistent with past practices, we've made slight adjustments to the algorithm in response to market conditions and are seeing the positive impact of those adjustments flow through the performance of our leasing pools";

(b) Woodley also said on the February 6, 2015 call that: "[T]he beauty of the model is our ability to make changes at any time to the underwriting algorithm, which we do on an ongoing basis";

(c) In Aaron's March 6, 2015 investor presentation, the Company addressed the algorithm, describing it as a "[p]roprietary automated decision system developed over several years" that "[u]tilizes customer application data enriched with attributes from third-party datasets." Aaron's further stated that these "[m]odels are continuously monitored and updated to optimize

performance"; and

(d) During Aaron's April 24, 2015 Earnings Conference Call, Defendant Woodley stated that, "Where we've found we win with retailers is when we can deliver the highest sustainable approval rate and highest sustainable conversion rate. And we do that by constantly improving our underwriting algorithm, which allows us to buy as deep as possible. We feel we are the market leader in that regard and we've invested a lot and are continuing to maintain that edge."

189. Aaron's announcement on January 19, 2016—just months after the end of the Class Period—that Defendant Danielson was "step[ping] down" as Aaron's CFO further supports a strong inference of scienter. Danielson had served as CFO of Aaron's for 26 years and served as a Director of Aaron's for 20 years.

190. Defendants Robinson, Woodley, Michaels and Danielson were also each senior officers of Aaron's with direct knowledge of the issues the Company faced and significant personal experience with those issues, and Defendants Robinson and Woodley also had extensive personal experience at Progressive. For example:

(a) Robinson is Aaron's CEO and serves as a member of its Board of Directors. Robinson was appointed CEO of Aaron's in November 2014, seven months after Aaron's acquired Progressive, where he had served as CEO and was familiar with the working and importance of Progressive's proprietary algorithm;

(b) Woodley has served as CEO of Progressive since 2015. Woodley joined Progressive in 2013 as the Company's Chief

Operating Officer and Chief Financial Officer, and became familiar with the working and importance of Progressive's proprietary algorithm; and

(c) Michaels was at all relevant times Aaron's President. Michaels was appointed President of Aaron's in April 2014 and became familiar with the working and importance of Progressive's proprietary algorithm, including its introduction at Aaron's brick-and-mortar stores, as well as the negative impact that problems with loan approval decisions or collection activities would have on core business financials.

(d) Prior to the January 2016 announcement that Danielson was stepping down as Aaron's CFO, he had served as CFO of Aaron's for 26 years and served as a Director of Aaron's for 20 years. In those roles he was familiar with Aaron's financial reporting and the negative impact that problems with loan approval decisions or collection activities would have on Aaron's financials.

191. Because these issues were so important to the valuation of Aaron's stock, Defendants made myriad public statements assuring investors that the Progressive acquisition was a benefit to Aaron's business. Analysts accordingly issued dozens of reports addressing this subject. In light of the attention that the market paid to this subject—and the fact that Defendants spoke reassuringly on this subject dozens of times—any failure by Defendants to ensure the accuracy of their repeated statements was severely reckless at a minimum.

## VIII. LOSS CAUSATION

192. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme

to deceive the market. These materially false statements and omissions concealed numerous material facts from investors, including but not limited to the fact that (i) in February 2015 the Company discovered that the Progressive algorithm lost access to critical data feeds and, as a result, did not make accurate credit decisions over an extended ten-week period; (ii) the leases approved by the algorithm during the ten-week outage had significantly higher rates of default; (iii) a software error in Progressive's lease management system software prevented the Company from timely identifying delinquent leases and initiating collections activities in the second and third quarter of 2015; (iv) Aaron's technology was dependent on non-redundant third party data feeds; and (v) as a result, consolidated and Progressive EBITDA as well as bad debt expense and merchandise write-offs were materially and negatively impacted. In addition, Defendants' false statements and omissions concealed from the market the risks known or foreseeable to Defendants, including the risk that leases underwritten in February, March and April 2015 would experience higher default rates. These false statements and omissions artificially inflated the price of Aaron's common stock and operated as a fraud or deceit on the Class.

193. When the falsity of Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on October 30, 2015, the price of Aaron's common stock fell precipitously, as the prior artificial inflation came out of

the price.

194. As a result of their purchases of Aaron's common stock during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws. Defendants' false and misleading statements and omissions had the intended effect and caused Aaron's common stock to trade at artificially inflated levels throughout the Class Period, reaching a high of $40.33 per share on October 9, 2015. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Aaron's business and prospects.

195. When the truth about the Company was revealed to the market, the price of Aaron's stock fell by $8.88 per share, or 26.5%. This decline removed the inflation from the price of Aaron's stock, causing real economic loss to investors who had purchased Aaron's stock during the Class Period.

196. The decline in the price of Aaron's stock after the corrective disclosure was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price decline in Aaron's stock negates any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts

unrelated to Defendants' fraudulent conduct.

## IX. PRESUMPTION OF RELIANCE

197. At all relevant times, the market for Aaron's common stock was an efficient market for the following reasons, among others:

(a) Aaron's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Aaron's filed periodic public reports with the SEC and the NYSE;

(c) Aaron's regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Aaron's was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

198. As a result of the foregoing, the market for Aaron's common stock promptly digested current information regarding Aaron's from all publicly available sources and reflected such information in the price of Aaron's common stock. Under these circumstances, all purchasers of Aaron's common stock during the Class Period suffered similar injury through their purchase of Aaron's common stock at artificially inflated prices and the presumption of reliance applies.

199. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Aaron's data loss—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Progressive's business, as set forth above, that requirement is satisfied here.

## X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

200. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

201. Aaron's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

202. Defendants acted with scienter because at the time that they issued public documents and other statements in the Company's name, they knew, or with

extreme recklessness disregarded, the fact that such statements were materially false and misleading or omitted material facts. Moreover, Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

203. As set forth in detail throughout this Complaint, Defendants, by virtue of their control over, and/or receipt of, the Company's materially misleading statements and their positions with the Company that made them privy to confidential proprietary information, used such information to artificially inflate the Company's financial results. Defendants were informed of, participated in, and knew of the improprieties and unlawful conduct alleged herein and understood their material effect on the Company's business and future prospects. With respect to non-forward-looking statements and omissions, Defendants knew and recklessly disregarded the falsity and misleading nature of that information, which they caused to be disseminated to the investing public.

204. Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, Defendants are liable for those false or misleading forward-looking statements because, at the time each such statement was

made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Aaron's who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XI. CLASS ACTION ALLEGATIONS

205. Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities that purchased or otherwise acquired the common stock of Aaron's during the Class Period from February 6, 2015 through October 29, 2015, inclusive, and were damaged thereby (the "Class"). Excluded from the Class are: Defendants; members of the immediate families of the Individual Defendants; Aaron's subsidiaries and affiliates; any person who is or was an officer or director of Aaron's during the Class Period; any entity in which any Defendant has a controlling interest; Aaron's employee retirement and benefit plan(s) and their participants or

beneficiaries, to the extent they made purchases through such plan(s); and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

206. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Aaron's has over 70 million shares outstanding and actively trading on the NYSE, owned by hundreds or thousands of investors. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class numbers in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

207. Lead Plaintiff's claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

208. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class. Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

209. Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include:

(a) Whether Defendants violated the Exchange Act;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e) Whether and to what extent the market the price of Aaron's common stock was artificially inflated during the Class Period because of the material misstatements and omissions alleged herein;

(f) Whether Defendants acted with the requisite level of scienter;

(g) Whether Defendants' conduct caused the members of the Class to sustain damages; and

(h) The extent of damage sustained by Class members and the appropriate measure of damages.

210. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

211. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

212. This Count is asserted on behalf of all members of the Class against Defendant Aaron's and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

213. During the Class Period, Defendants disseminated or approved the false statements specified herein, among others, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

214. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in

order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Aaron's common stock during the Class Period. As detailed herein, the misrepresentations contained in, or the material facts omitted from, those statements included, but were not limited to the following:

(a) During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase Aaron's common stock at artificially inflated prices.

(b) Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Aaron's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

215. Defendants, individually and in concert, directly and indirectly, by the

use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

216. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

217. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Aaron's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

218. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Aaron's common stock. Lead Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Aaron's common stock had been artificially inflated by Defendants' fraudulent course of conduct.

219. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

220. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

221. Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

222. The Individual Defendants acted as controlling persons of Aaron's within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Aaron's, the Individual Defendants had the power and ability to control the actions of Aaron's and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

(a) Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b) Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiff and all members of the Class against all Defendants, including interest thereon;

(c) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d) Such other further relief as the Court may deem just and proper.

**JURY TRIAL DEMAND**

Lead Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: October 27, 2017 Respectfully submitted,

/s/ Michael A. Caplan
Michael A. Caplan
**CAPLAN COBB LLP**
Georgia Bar No. 601039
75 Fourteenth Street, N.E.
Atlanta, Georgia 30309
Telephone: (404) 596-5610
Facsimile: (404) 596-5604

*Liaison Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Adam Wierzbowski (*admitted pro hac vice)*
Brenna D. Nelinson (*admitted pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1448
adam@blbglaw.com
brenna.nelinson@blbglaw.com

**LABATON SUCHAROW LLP**
Michael W. Stocker (*pro hac vice pending*)
Alfred L. Fatale III (*pro hac vice pending*)
Christopher Barraza (*pro hac vice pending*)
140 Broadway
New York, New York 10017-5563
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
mstocker@labaton.com
afatale@labaton.com
cbarraza@labaton.com

*Co-Lead Counsel for Lead Plaintiff Arkansas Teacher Retirement System and the Class*